# CHARLESTON.

## STEWART v. VANDERVORT.

*(HOLT, JUDGE, absent.)

Submitted June 7, 1890.—Decideded December 16, 1890.

1. MARRIAGE—ALIMONY.

A marriage occurring while section 1, c. 109, Code Va. 1860, was in force between persons, one of whom had a husband then living, is absolutely void without decree. It conferred no right to alimony. Though the parties cohabited since the Code of 1868 took effect, and though a suit to declare the nullity of such marriage was brought under the Code of 1868, no 'alimony can be decreed therein to the woman.

2. MARRIAGE—ALIMONY.

Such marriage, as to the question of its validity or legal character, and on the question of alimony, is to be tested by the law in force when it was celebrated.

3. CONSTRUCTION OF STATUTES.

A cardinal rule in interpreting statutes is to construe them as prospective in operation in every instance, except where the intent that they shall act retrospectively is expressed in clear and unambiguous terms, or such intent is necessarily implied from the language of the statute, which would be inoperative otherwise than retrospectively. In doubt it should be resolved against rather than in favor of its retroactive operation.

*P. H. Keck* for appellant cited, Code (1860) p. 529, s. 1; Code (1868) p. 440; 1 Min. Inst. 272–279, 299, 302; 2 N. Y. 596.

*Berkshire & Sturgiss* for appellee.

BRANNON, JUDGE :

On May 4, 1848, Asbury Vandervort and Rebecca Jane McClastey were married in Monongalia county, and in 1856 removed to the then far west, to Iowa, there living together until 1860, when one morning before daybreak he arose from his bed, and abandoning his wife and only child, a daughter then about eight years of age, without intimation

---

*Case submitted before Judge Holt's appointment.

to either of them of any intention to desert them, went to Illinois, where he remained, moving to several different points, until September, 1888, when he returned to Monongalia county, in this State. In all the twenty eight years from his desertion to August, 1888, there was no communication between him and his wife and child; no tidings whatever came to him of them, nor to them of him ; their existence was as if blotted out to him, and his to them. His family, as his brother says, regarded him dead. She states he had been sick for two years, had not worked any for two months, had taken a great deal of quinine for ague, and his mind was weak, but he was not a maniac; that the same week he left she heard he had gone towards the Mississippi river; that she wrote to Virginia to know if he had come here, but friends had heard nothing of him; that she advertised for him in two or three papers. In 1864 the wife and child returned from Iowa to Monongalia county, and on October 1, 1867, after a few months courtship, she and William N. Stewart were married in Monongalia county. Stewart and she cohabited as man and wife until August, 1888. While she was absent visiting in a neighboring county a letter came from the first husband to Monongalia county to his brother, informing the latter that he would soon visit him ; and when she reached the depot at Morgantown, on her return home, she was informed reliably of this fact, and advised not to return to Stewart's house ; and she and Stewart never afterwards lived together. Early in September, 1888, the first husband appeared in Monongalia.

It clearly appears that Stewart believed the first husband, Vandervort, dead when he married Mrs. Vandervort. He says that he stated to her before the marriage that he had heard some doubts expressed whether Vandervort was dead, and she replied that he was dead, and that he had taken quinine and lost his reason, had wandered away and was found dead on the prairie thirty or thirty five miles away ; that the body was badly decayed; that she did not go to see him, but the evidence from the hair and clothing proved that the body was that of her husband; and that this statement allayed his fear. She says that she

got a lady friend to tell him about her husband's death; that before the marriage he said to her that his brother had said there was a probability that her first husband might be living, and she then asked him if this lady had not told him the circumstance, and he said she had told him about the disappearance, and some clothes being found; and that she herself then told him that the clothes were found, and a man answering his description found dead in a corn-field twenty miles from where they lived; and that still later, Stewart still mentioning the subject, she said to him, "Mr. Stewart, I have told you all I know about him, and if you are not satisfied, it is all right;" and he never mentioned it afterwards.

It may be said that she might have had more definite information by tracing her husband up, or at least going to the place where the dead man spoken of by hearsay was. But he had been long gone without a syllable from him, and she living close to his kindred, and hearing nothing, it is probable that she believed him dead, and acting on the legal presumption of death, from seven years' absence without information of his continued life, she married the second time under honest conviction of his death. When she married Stewart he had seven children aged from two months to thirteen years. She says she took charge of his household affairs and children, and discharged her duties faithfully as a wife for Stewart. She says: "I worked, I washed, churned, milked, and cooked through the day. At night I would sit and sew, patch and darn till twelve, one and two o'clock." Having doubt about his legal *status*, especially in view of the change in the law below spoken of, Stewart brought this suit to have a judicial sentence of the nullity of the second marriage, and a decree was rendered declaring its nullity, but requiring him to pay her five hundred dollars alimony; and to get relief from this alimony he appeals to this Court.

To constitute a valid marriage, the parties must not only be willing to marry, but they must not labor under any legal disability. Prior marriage was not, at common law, a canonical disability rendering the contract merely voidable, but it was a civil or legal disability, rendering the sec-

ond marriage void absolutely to all intents and purposes, being condemned by the New Testament (Matt. xix. 4–9 : 1 Cor. vii. 4) and by the laws of most states.  1 Tuck. Bl. Comm. 93; 1 Min. Inst.  237; 1 Bish.  Mar. & Div. § 300. By the statute law in force when this second marriage was solemnized (Code Va. 1860, c. 109, s. 1) it was absolutely void, for it provided that all marriages prohibited by law on account of either of the parties having a former wife or husband then living should "be absolutely void, without any decree of divorce or other legal process."   But though such a marriage is void without judicial sentence of its nullity, for obvious reasons such sentence is prudent and advisable, and the same statute in section 4 gave either party right to sue to obtain such a decree.

The question arises whether in granting a decree of the nullity of such a marriage, alimony could be given the woman.   Here it is very clear that, without authority of statute, alimony can not be decreed, for it never was a marriage—the woman never was a wife.   2 Bish. Mar. & Div. § 376; Schouler, Husb. & Wife, § 553.   Then is there any statute conferring power on a court to give alimony in such case?  Suppose the suit brought before our Code of 1868.   Code, (1860) c. 109, s. 12, provides that upon decreeing the dissolution of a marriage and also upon decreeing a divorce, whether from the bond of matrimony or from bed and board, the court shall make such further decree as it shall deem expedient concerning the estate and maintenance of the parties or either of them.   Now this is not a suit for divorce from the bond of matrimony or from bed and board under secs. 6 and 7, for causes therein specified; but it is a suit to declare the nullity of the marriage under sec. 4; and therefore this case can not fall under the words of sec. 12, "and also upon decreeing a divorce, whether from the bond of matrimony or from bed and board ;" and, if it falls under that section at all, it must be under the words, "upon decreeing the dissolution of marriage."

Here we must recall the fact that this is no marriage. Literally, the expression, " upon decreeing the dissolution of marriage," would call for a marriage, not a nullity ; for

it is a contradiction in terms to talk about decreeing the dissolution of a marriage when that with which we are dealing is not the shadow of a marriage. But though, strictly speaking, this is so, the question occurred to me whether, for the purposes or within the meaning of the language, " upon decreeing the dissolution of a marriage," such a marriage could be regarded a marriage in the eye of this Code chapter, especially as it gives a suit to declare the nullity of a marriage, and then provides what may be done upon decree; in other words, would section 12, providing what courts might do as to maintenance upon decreeing, apply to all marriages as to which preceding sections allowed suit to be brought? What marriages do these words, " upon decreeing the dissolution of a marriage," relate to? Turning back to section 1, c. 109, Code 1860, we find it providing for diver kinds of defective marriages, stamping some as void absolutely, others as void only from decree. It reads :

"All marriages between a white person and a negro, and all marriages which are prohibited by law on account of either of the parties having a former wife or husband then living, shall be absolutely void, without any decree of divorce or other legal process. All marriages which are prohibited by law on account of consanguinity or affinity between the parties, all marriages solemnized when either of the parties was insane, or incapable from physical causes of entering into the marriage state, shall, if solemnized within this State, be void from the time they shall be so declared by a decree of divorce or nullity, or from the time of the conviction of the parties under the third section of the one hundred and ninety sixth chapter," (that is, for marrying relatives.)

Now, as this covers two classes of defective marriages, that is, those void and those voidable only by judicial sentence, I would apply the words, " upon decreeing the dissolution of a marriage * * * the court may make such further decree as shall seem expedient concerning the estate and maintenance of the parties," not to the marriages declared by the first section absolutely void without decree, which never for a moment were marriages, but to those de-

clared void from the time of decree, which until such decree are valid. Under this section 1 are marriages defective because of what at common-law were regarded as canonical disabilities, which both at common-law and under this section would be voidable only, and also marriages void both at common-law and under this section because of legal disabilities; and though we may say the statute makes all the impediments now legal, yet it preserves the distinction aforetime prevailing between the effect of canonical and legal disabilities, that is, between marriages void and marriages voidable, and I do not think the Code of 1860 intended to confer on courts power to allow alimony where the marriage was absolutely void. Thus tested by the Code of 1860 in force when this second marriage occurred, I conclude that no alimony could be given her.

But some complication is infused into the case by the change of the statute made by the West Virginia Code of 1868; for c. 64, s. 1 of that Code, makes none of these marriages absolutely void without decree, but makes all void only from decree. It reads as follows : "All marriages between a white person and a negro ; all marriages which are prohibited by law on account of either of the parties having a former wife or husband then living; all marriages which are prohibited by law on account of consanguinity or affinity between the parties; all marriages solemnized when either of the parties was insane, or incapable from physical causes of entering into the marriage state, or under the age of consent—shall, if solemnized in this state, be void from the time they are so declared by a decree of divorce or nullity."

The Code of 1868, c. 64, s. 4 gives a suit for annulling a marriage, sections 5 and 6 suits for the two kinds of divorce, and section 11 is just the same as section 12 in the Code of 1860 relative to decreeing maintenance; so that, though the first section of this chapter in the Code of 1868 makes all marriages void only from decree, it leaves the provision as to decreeing maintenance the same. It may thus be, though we are not called on to say, that on decreeing the nullity of such a marriage as this, solemnized since the 1st day of April, 1869, when the Code of 1868 took effect, ali-

mony might be decreed, as it might be said that under the Code of 1868 such a marriage is not a nullity, but a marriage, until a decree of dissolution. But suppose this were so, does this marriage, dating before this great change in the law, fall under the new law? Can this amendment have the effect to convert a marriage void under the law in force when it occurred into a legal marriage, and impart to it the right of alimony which it did not then possess? Can the amendment retroact and bind the man by an obligation, a proprietary obligation, not imposed on him by the law then in force—that is, to give alimony? This is a proprietary obligation, for it would lay upon his property the burden of alimony.

In the first place, one of the cardinal rules by which courts are governed in interpreting statutes is that they must be construed as prospective in every instance, except where the intent that they shall act retrospectively is expressed in clear and unambiguous terms, or such intent is necessarily implied from the language of the act, which would be inoperative otherwise than retrospectively. It is not enough that the language is general enough to cover past transactions to justify a retroactive construction. Every reasonable doubt is resolved against a retroactive operation of the statute. Wade, Retro. Laws, §§ 34, 35; *Duval* v. *Malone*, 14 Gratt. 24; 1 Bish. Mar. & Div. §§ 98–103; Bish. St. Crimes, § 82; 1 Tuck. Comm. 2, 4, 16; 2 H. & M. 181; 3 Call. 268; 4 Munf. 109; 5 Rand. 5, 11; *McCance* v. *Taylor*, 10 Gratt. 585. "Words in a statute ought not to have a retrospective operation unless they are so clear, strong, and imperative that no other meaning can be annexed to them, or unless the intention of the legislature can not be otherwise satisfied; and such is the settled doctrine of the court"—is the language used twice, at least, by the United States Supreme Court as its rule in this matter. *U. S.* v. *Heth*, 3 Cranch, 413; *Chew Heong* v. *U. S.*, 112 U. S. 559 (5 Sup. Ct. Rep. 255.)

This is a fundamental and salutary principle in the construction of statutes, and dates back to an ancient date in the English law, expressed in the rule and law of parliament that *nova constitutio futuris formam debet imponere non*

*præteritis.* 6 Bac. Abr. 370; Bracton, lib. 4, fol. 2; 1 Minor, Inst., 23. Lord Coke lays down the rule, and I think his rule is applicable in this case, that acts of parliament are to be so construed as that no man shall by literal interpretation be punished or endamaged. 2 Co. Litt. 360a. Blackstone, in 1 Comm. 46, says, that all laws are to commence *in futuro,* and operate prospectively. A notable early instance of this rule of construction was under the statute which broadly declared that, "from and after the twentyfourth of June, 1677, no action should be brought to charge any person upon any agreement made in consideration of marriage, * * * unless such agreement be in writing;" and it was held in the court of king's bench not to apply to promises before the act. *Helmore* v. *Shuter,* 2 Show, 17, 2 Mod. 310, 2 Lev. 227, T. Jones, 108. As KENT, C. J., says, when we consider that this decision was as early as the reign of Charles II., we are impressed with the spirit of equity and independence of the English courts.

This principle was taken from the civil law. See case of *Dash* v. *Van Kleeck,* 7 Johns. 477, and note, where full discussion of this doctrine will be found. In *In Re Tuller,* 79 Ill. 99, it is held that "generally all laws are to be construed as prospective, and not to prejudice or affect past transactions of the citizen." A statute declared that a marriage shall be deemed a revocation of a prior will, and it was argued that as the will did not take effect, and no rights vested under it, until testatrix's death, its validity depended on the statute as it was at her death; but the court said not.

In *City of Richmond* v. *Supervisors,* 83 Va. 204 (2 S. E. Rep. 26) it is held that this rule applies to remedial statutes; and the quotation is made from Potter's Dwar. St. 164, note, that "even remedial statutes are to be deemed prospective in operation, and not to be applied to proceedings pending at the time of their enactment, unless a contrary intent appears."

In addition to this rule forbidding a retroactive operation to statutes by mere construction, it is to be noted' that the Code of 1868 itself, which changed the law as above stated, in chapter 166, ss. 1, 2, provides that its adoption shall re-

peal all statutes of a general nature, but that their repeal shall not affect any act done, or any right established or accrued, before its adoption, save that proceedings thereafter had shall conform as nearly as practicable to the Code. I do not say that statutes merely regulating the conduct of legal proceedings in courts do not apply to past transactions, but when they touch the essential right of a party they cease to have that character. Here it is not a matter relating only to the remedy; it affects the right of the party essentially. See Pott. Dwar. Stat. 162, and note 9. Surely, under this rule, there is no call upon us to say that the new statute makes that a marriage which till then was not, and imposes a pecuniary burden on the man charging his property not imposed on him by the law testing the transaction when it occurred. Were we, by plain language importing a retroactive intent in the legislature, called on to give the Code of 1868 such affect, I should say that there was no power in the legislature to enact such a statute affecting the personal rights of the citizen so seriously and gravely, by converting a union not matrimonial in legal aspect into a matrimonial relation, and imposing the burden of alimony where none was before, because it would in effect take one man's property, and give it to another, and violate that feature of our constitutional law which says that the citizen shall not be deprived of his property without due process of law. Statutes can not validate deeds, wills, and judicial proceedings, and thus divest vested rights of property from one, and confer the same on another· Neither can they validate a marriage void *in toto* at the time when made, and thus impose the burden of alimony— the burden of maintenance of a person as a wife who in law is no wife. See Wade, Retro. Laws, § 156 *et seq.* "Every statute which takes away or impairs a vested right acquired under existing laws, or creating a new obligation, imposes a new duty, or attaches a new disability in respect of transactions or considerations already past, must be deemed retrospective in operation, and opposed to those principles of jurisprudence which have been universally recognized as sound." Broom, Leg. Max. 68.

Hard as may be the fate of the defendant, after living

and laboring with the plaintiff twenty one years, to be turned out upon the world penniless in old age, the plaintiff objects to paying this alimony, and this Court must apply the law as it sees it, and reverse so much of the decree as requires the plaintiff to pay the defendant five hundred dollars, and in all other respects affirm it.

AFFIRMED IN PART.     REVERSED IN PART.

NOTE —I did not think it necessary, when writing the above opinion, to advert to the presumption of death arising from seven years' absence, thinking it plain that it could not prevent a second marriage from being void. It may be of some use to add this note: The Code of 1860 and our Code contain provisos that the crime of polygamy does not exist where, at the time of a second marriage, the former wife or husband shall have been continually absent seven years and shall not have been known to be alive within that time; but the Virginia statute touching the validity of marriages declare the second marriage void without any such previso. 1 Bishop's Mar. and Divorce, ? 299, says: "We should understand, that, if a first marriage subsists undissolved by divorce, the second marriage is void, even though, by reason of some exception in the statute against polygamy, or by force of some principle of the common law of crimes, the person entering into the marriage should be exempt from the statutory penalty." He cites an array of authorities. In *Glass* v. *Glass*, 114 Mass. 566 GRAY, C. J , speaking of the statute which declared all marriages prohibited by law on account of either party having a former wife or husband then living, "shall be void without any decree of divorce or other legal process," said that such absence would not prevent the second marriage from being void, and it was held to be void notwithstanding seven years absence. See 14 Amer. and Eng. Ency. Law, 499, n. 3.
HENRY BRANNON.