# CHARLESTON.

## KELLEY *v.* RAILROAD CO.

Submitted June 13, 1905.    Decided October 31, 1905.

1. TRIAL—*Demurrer to Evidence.*

Upon demurrer to evidence by defendant, if the plaintiff's evidence is sufficient to sustain his case, oral evidence of the demurrant conflicting with that of the demurree is ignored, and the demurrer overruled, unless the oral evidence of the demurrant be so clearly preponderant over that of the demurree that a verdict for the demurree would be set aside. (p. 221.)

2. DEATH—*Wrongful Act—Damages.*

In an action in behalf of a father for killing his son by wrongful act or negligence, the jury is not confined to compensatory damages for mere pecuniary injury, but may consider the sorrow, the mental distress and bereavement of the father. (p. 222.)

3. RAILROADS—*Injury to Persons—Signals.*

When the trainmen see a person walking on a railroad track they must give him an alarm signal at such distance before reaching him as will enable him to hear it and get off the track. Until such alarm is given they cannot act on the assumption that he will get off the track. (p. 225.)

Error to Circuit Court, Wayne County.

Action by John Kelley against the Ohio River Railroad Company. Judgment for plaintiff, and defendant brings error.

*Affirmed.*

VINSON & THOMPSON, for plaintiff in error.

MARCUM, MARCUM & SHEPHERD and W. W. MARCUM, for defendant in error.

BRANNON, PRESIDENT:

This is an action by John Kelley as administrator of James Kelley against the Ohio River Railroad Company to recover damages for killing James Kelley by running a passenger train against him. The defendant entered a demurrer to the evidence, and upon it the court rendered judgment against the defendant for $5,000, the damages assessed by a jury.

James Kelley and one O'Conner were walking along the railroad track, using it for a foot-way, and were struck by a passenger train running at the speed of thirty-five or forty miles an hour, and both were killed. The case does not involve the question of the liability of a railroad company for failure to keep a lookout for persons on its tracks; for it is without question that the trainmen could see Kelley and O'Conner on the July day on a straight track for more than half a mile, and did see them for a long distance before they were struck. The single question is a question of fact, that is, whether the trainmen, after discovering Kelley and O'Conner on the track, were guilty of negligence in failing to sound an alarm at the proper distance before striking them. It is undeniable law that one walking upon a railroad track, using it as a foot-way, is a trespasser and in that very act is guilty of great negligence, *Spicer* v. *Railroad Co.*, 34 W. Va. 514. But whilst such is the law, it is also settled law that after the trainmen have discovered one so walking upon the track they owe to him a duty under the law. They cannot injure him by wilful or gross or wanton negligence. *Spicer* v. *Railroad Co.*, 34 W. Va. 514. Whatever be the duty of a railroad company's agent to keep a lookout to discover persons on the track, certain it is that when the trainmen have discovered a human being on the track, and in danger, they must give him warning of the train's approach, such a warning, by whistle or bell, at such a distance before reaching the trespasser, that he will be able to hear, take a thought for his safety, and get off the track. Common humanity demands this. True, he is a trespasser and in the wrong; but though every man who uses the railroad track as a footway is committing a tresspass, has placed himself within the precincts of danger where he has no right to be, and is guilty of gross negligence, yet people do walk upon railroad tracks, and the law, from sheer necessity, has established the rule, applicable not only to railroads, but generally applicable, that it is the duty of one from whom the injury comes that he shall, when he sees a man in danger, use reasonable care, take reasonable steps, reasonable under the circumstances of the particular case, to save the man in danger. He cannot punish the tresspasser for his wrong. It is a condition, not a

theory.  He cannot thus himself be guilty of a great wrong.
He must help his perishing brother by doing what he rea-
sonably can to warn and save him.   These men were absent
minded in conversation.   Some become listless and abstracted
in mind; they are entitled to warning; at any rate so the law
is.   Under this principle it is the duty of a railroad company,
it was the duty of the defendant in this case, to blow an
alarm with its locomotive, at a point far enough from
Kelley to reach his ears, allowing him to realize his danger,
and take steps to save himself from the rushing deadly loco-
motive.   *Raines* v. *Railroad*, 39 W. Va. 50; *Teel* v. *Rail-
road*, 49 *Id.* 85; *Ray* v. *C. & O. Co.*, 57 W. Va. 333, (50 S.
E. 413), 3 Elliott on Railroad, sections 1253, 1257.   In that
late great work, Thompson's Commentaries on Negligence,
Vol. 1, section 238, we find this:     "The Courts are almost
universally agreed that, notwithstanding the fact that the
plaintiff or the person injured has been guilty of some negli-
gence in exposing his person or property to an injury at
the hands of the defendant, yet if the defendant discovered
the exposed situation of the person or the property, in time,
by the exercise of ordinary or reasonable care after so dis-
covering it, to have avoided injuring it, and nevertheless
failed to do so, the contributory negligence of the plaintiff
or of the person injured, does not bar a recovery of damages
from the defendant.   The rule is aptly illustrated, by taking
the case where a person negligently walks upon a railroad
track, and fails to keep out of the way of a passing train.
If the engineer, after noticing his exposed situation, fails to
stop his engine, or give the proper signals, or otherwise act
willfully and recklessly, in consequence of which the person
is killed or injured, the company shall be liable to pay dam-
ages."    These unfortunate men were on the railroad track,
seen by the engineer and fireman, as they themselves say,
for a very considerable distance before they were struck,
in open day light.    They say that when the train struck
the straight track they saw the men.    They saw them be-
fore blowing a crossing signal, at least one thousand feet
before the men were struck.    Furthermore, the engineer
swore that after blowing the whistle he saw that the men
were making no effort to get off the track.    The facts fully
establish beyond dispute that the trainmen saw these men,

and saw, and had occasion to realize, plain reason to realize, that they were in imminent danger, and did realize it.      Every body must know that an engineer who sees two men walking in front of his engine, flying at the rate of forty miles an hour, only a few feet away sees that they are in imminent danger.      True, the engineer may assume that the tresspasser will get off the track; but when he sees for several hundred feet that he makes no effort to get off the track, it must inevitably arouse a reasonable apprehension that the man does not realize his danger, and that the case calls for prompt alarm signals. If it be true, as the engineer says, that he blew a crossing signal one thousand feet away from the men, that very fact, and the fact, that the men still kept walking the track were enough to tell the engineer that the men were listless, and to watch them closely, and to alarm them at the proper point. But the engineer and fireman let these men walk on, according to the plaintiff's evidence, without any sound of alarm until the moment before the engine struck them and hurled them into eternity.      Three witnesses swear pointedly that they heard no whistle at the crossing even.      Three witnesses swear that the locomtive gave two toots for alarm, but did not do so until just as the engine struck the men.      One of the witnesses says it struck them just as the second toot was sounded.      If this be so, if this is a fact, then the liability of the company is infallibly fixed under the law of the land, and really here the case ends.      Remember that we are upon a demurrer to the evidence, and under principles applicable to a demurrer to the evidence we cannot get away from accepting as a fact that no kind of alarm signal was given until just as the locomotive struck Kelley and O'Conner.      There is conflicting evidence, or conflicting in tendeney and effect, disputing the theory that no alarm was given until just as the engine struck the men.      Two witnesses say that the train was nearly opposite the residence of Bowe; that the engine had passed the house, but that some of its cars were opposite it when the alarm was sounded, and Bowe measured from the point where the train was when it gave the alarm to the point where it struck Kelley and O'Conner, and found it to be three hundred and forty-five feet.      Now, can Bowe be certain as to the point at which the train was?      The

train was flying. Is this evidence as certain as that of the three men who saw the men struck and heard the whistle at the same time? One of these three witnesses, when cross-examined, was asked if he had an idea how far the engine was from the men when it blew the first whistle, and answered that he did not know. When asked if it was as much as one hundred yards he said he did not know. This somewhat weakens his evidence. but the fact remains that he said, "She whistled twice about the time she hit them." Besides, two other men swear the same thing. He was a boy thirteen years of age and we all know that under cross-examination children are not always consistent in all their statements. It is said that Bowe's measurement of the distance was with a tape line, whereas the three witnesses who said that the whistles were just as the men were struck, merely guessed distance with the eye. There was no distance for them to measure, because they say pointedly that the train struck the men just as it whistled two short toots, one after another. The engineer and fireman say that they discovered that the men were making no effort to get off the track about the train's length before the men were struck, and that the alarms were given that distance before the men were struck, that is three hundred and twenty feet. Now, these versions conflict upon a most material controlling point, that is, as to where the train was, with reference to Kelley and O'Conner, when the alarm was blown? What must the court do under a demurrer to evidence? Can it reject as mistaken or untrue the definite statements of three witnesses that no alarm was given until just as the men were struck, and accept as correct and true the adverse evidence? That adverse evidence may be the truth. It may be that injustice is done in this case. After patient examination by the Court of this case we feel some reluctance in rendering the judgment which we render. It may do injustice, but we feel that we cannot, under principles governing demurrers to evidence, throw away the case plainly made by the plaintiff's evidence, and take that made by the defendant's. The law forbids this. We cannot say that there is a decided, plain, preponderance of evidence in behalf of the defendant. Neither in number nor weight is there preponderance for the defendant. Two witnesses swear that the train was three hun-

dred and twenty feet from the men when the whistle was blown. Three witnesses flatly deny this. We have no reason to say that those three are false. The evidence of the two witnesses who say that the engine had just passed Bowe's house has not that degree of certainty as to just where it was to enable us to say that it was distant from Kelley and O'Conner. They might be mistaken as to the exact place of the engine. Our cases relative to the treatment of demurrers to evidence say, that when the evidence of the two sides directly or in effect conflicts the oral evidence of the demurrant conflicting with that of the demurree is disregarded, and the evidence of the demurree is held to prove all that it can fairly be regarded as proving, and the demurrer is decided against the demurrant, unless the evidence of the demurrant clearly and decidedly preponderates against the demurree's case, or his case is without sufficient evidence to sustain it. Still, if the preponderance in favor of the demurrant is so clear and decided that the court ought to set aside a verdict against him, his demurrer ought to be sustained. But the demurrant by his demurrer takes the case from the jury, and if the evidence is such that a verdict for the demurree would stand, the demurrer to the evidence must be overruled. To sustain the demurrer the evidence must plainly preponderate, decidedly preponderate, not be merely doubtful, so that different persons might come to different conclusions. *Barret* v. *Coal Co.*, 55 W. Va. 395; *Mannon* v. *Railroad*, 56 *Id.* 554; *Shaver* v. *Edgell*, 48 *Id.* 502; *Gunn* v. *Railroad*, 42 *Id.* 681. Now, suppose there had been no demurrer to evidence, and the jury had found for the plaintiff. Could we set it aside, if we followed old and well settled principles governing motions for new trial under conflicting evidence? We could not do so. That is the test. As the party takes from his adversary the right to lay his evidence before a jury, should his adversary not have right to have it weighed as it would be after verdict? We are bound to sustain the circuit court in its judgment on demurrer to evidence. We cannot escape from it.

The engineer and fireman say that crossing signals were blown for a road one thousand feet away. This is claimed to be a compliance with all the duty of the defendant. There are several answers why it was not. It was not that short,

sharp distress whistle for alarm. Again, after that whistle the engineer says he noticed that the men were not going to get off the track. This called for an alarm whistle. Anyhow, the fact that the men still kept on the track called for the alarm whistle.

The defendant complains of the refusal of instructions. One was that if the plaintiff failed to show that he had suffered any pecuniary or actual loss by the death of his son, and that he received nothing for his labor, and was not dependent upon him, only nominal damages should be found. The Code chapter 103, sections 5, 6, gives an action for death in case of wrong to the administrator of the decedent for the benefit of his kin, wherever he would himself be entitled to recover damages, if death had not ensued. Can it be thought that the statute contemplates only one cent damages? The deceased was thirty-seven years of age, in good health, unmarried. His father, his sole distributee, to whom the damages go under the statute, was seventy-five years of age, and might the next week after his son's death be stricken with infirmity and disability to labor. Also he was bereaved of his son, and cast into sorrow, gloom and disconsolation of soul. Can it be supposed for a moment, although the old father was still able to labor for self-support, that he would continue so, and that the Legislature intended to give him only one cent damages? We cannot realize that the statute designed only nominal damages in such a case. Moreover, the statute expressly says that, "In every such action the jury may give such damages as they shall deem fair and just, not exceeding $10,000, and the amount so recovered shall not be subject to any debts or liabilities of the deceased." This does not make the recovery dependent on the fact that the person should be dependent on the deceased. No such exception is incorporated in the statute, and the very fact that the recovery is not liable to the debts of the dead man shows that it was designed for the comfort and support of the next of kin, not merely in his condition to-day, but for his future need. *Searle* v. *Railway*, 32 W, Va, 370; 8 Am. & Eng. Ency L.; (2 Ed.), 923.

Another instruction refused told the jury that they could not consider sorrow, grief and sentimental feelings that the father may have felt occasioned by the death of his son, un-

accompanied by any pecuniary loss, actual or prospective. The statute makes no such limitation. We think the jury had the right to consider those matters, because they enter into the loss, and because the statute gives unlimited discretion as to the amount of the damages to the jury within the limit of ten thousand dollars. The statute gives to those closely related to the person killed by tort a recovery, and we do not see why the jury may not consider the father's grief, bereavement and anguish of soul under the loss of his son in his old age.

Much law will be found in the books saying that the jury cannot consider mental suffering and sorrow in fixing damages; but the most of the decisions propounding this doctrine are based on statutes which limit the damages with reference to "pecuniary injury." The Virginia statute does not contain those words, but says that, "The jury may award such damages as to it may seem fair and just." Three times has the Supreme Court of Virginia decided that the recovery is not limited to pecuniary or merely compensatory damages, but that they may be punitive or exemplary, expressly holding that mental anguish and sorrow of the bereaved father may be taken into consideration by the jury in fixing the amount of their verdict, and the damages may be given for *solatium*, solace, consolation. *Mathew* v. *Warner*, 29 Grat. 570; *B. & O. Railroad Co.* v. *Nowell*, 32 *Id.* 394; *Anderson* v. *Hygeia Hotel*, 92 Va. 692. This Court has explicitly approved the construction of that act as given by the Virginia court holding that the damages are not limited to pecuniary or compensative damages, but may be punitive or exemplary. *Turner* v. *Railroad*, 40 W. Va. 676; *Thompson* v. *Electrical Co.*, 54 *Id.* 395. Now, if damages may be examplary under these decisions, why cannot the mental distress of the bereaved father be considered? It enters into punitive damages. The Virginia court departs from many other decisions in other states because their statutes, either expressly or by construction, were limited to "pecuniary injury;" whereas, the Virginia statute was not. But this is not all. The case is clearer in West Virginia still. And why? Because our first act giving action for death caused by wrongful act expressly limited the jury to damages "with reference to the pecuniary injury resulting from such death." So it reads

in Acts of 1863, chapter 98. But when the Legislature made the Code of 1868, chapter 103, section 6, it left out those words and broadly declared that, "in every such action the jury shall give such damages as they shall deem fair and just, not exceeding five thousand dollars," and in re-enacting section 6, by chapter 105, Acts of 1882, it reads, "in every such action the jury may give such damages as they shall deem fair and just, not exceeding ten thousand dollars," still leaving out the provision that the damages should be limited to "pecuniary injury." Now, this change from the Acts of 1863, in this material feature, clearly means something. We are bound to take the act as it reads. We are bound to strike out the words "with reference to the pecuniary injury," because the Legislature has twice approved the change from the Act of 1863, by leaving those words out. This ought to be the construction of the act or else the willful murderer will pay only uncertain compensatory damages which will not atone for the grief and anguish of the bereaved mother and father. His money ought to pay for their consolation, as far as money can give consolation. Why shall he not do so when he has brought the gray hairs of a father or mother in sorrow to the grave? He has caused the grievous loss from which heart or soul suffers more than from pecuniary loss.

A third instruction was refused. It says that in fixing damages the jury should not fix punitive or exemplary damages, but must be limited to such as would compensate the father for actual loss sustained by reason of the death of his son. We think this instruction was properly rejected under principles stated in *Turner* v. *Railroad*, 40 W. Va. 675, and *Thomas* v. *Electrical Co.*, 54 *Id.* 395. It is usless to re-discuss the subject of the discretion of the jury under said act.

For these reasons we affirm the judgment.

*Affirmed.*

### REHEARING REFUSED.

A petition for rehearing asserts that in the decision announced in the above opinion we have run counter to the cases of *Raines* v. *Railroad*, 39 W. Va. 50 and *Teel* v.

*Railroad*, 49 *Id*. 85. We do not so see it. Plainly the *Raines case* says that "if those running a train discover a trespasser in immediate danger, they must use all reasonable exertions to avoid inflicting injury; otherwise the company will be liable." The argument for the company in this case is, that the engineer had the right to assume that the trespasser would get off the track. So he may, so far as not to require him, after alarm signal, to stop the train or lessen speed; but he cannot so assume as to dispense with such warning. After discovery he must give the track-walker the benefit or chance of a warning. The *Raines case* says that the train men "having given such signals as are required, have a right to act on the presumption that such person will step aside in time to remove himself from danger." This pointedly demands the signal before the right to act on that presumption begins. The law cited in the two opinions in the *Raines case* shows this. Thompson, Com. on Negligence, Vol. 2, section 1736, says that "after having given sufficient warning by whistle or bell he (the engineer) has a right to act on the presumption that the trespasser will quit the track." Who can dispute that the decisions demand that warning after discovery? The very fact that the law demands such warning denies that it can be dispensed with on the theory that the engineer may assume that the track-walker will get off the track. Why call for warning, if this is not so? The Tell case supports our decision. It says that the engineer who discovers a person on the track is not bound to stop the train, unless he sees that the person is helpless; "but the engineer's only duty toward such obstructor is to give the alarm signals necessary to warn a person of sound mind and good hearing in time to allow such person to vacate the right of way." Now, what do we say in the above opinion contrary to these cases?

Complaint is made against the above opinion that it calls for a warning "at such a distance before reaching the trespasser, that he will be able to hear, take a thought for his safety, and get off the track." Of what use would the warning be unless it gives time to "take a thought" for safety? It must be in time to reach the mind. "If the engineer sees the trespasser and waits until the warning by whistle will do no good, when by whistling sooner he could have

enabled him to escape, the company is liable." *Lake Shore* v. *Bodemer*, 32 Am. St. R. 218.

It is said that the Raines case accepted station and crossing signals five hundred feet away from the person as a sufficient signal. The fact was only mentioned. There were alarm whistles. Even if we say that the station whistle was held enough, it does not follow that a whistle one thousand feet away would be the same as one five hundred feet away.

It is said that the Raines case held an alarm twenty feet off sufficient. It must be admitted that was close; but the Court said it was twenty to thirty feet. In that case the train was going fifteen miles an hour, in this forty miles. That would call for a distance of fifty feet in this case. But why so measure when three witnesses say that there was no alarm until just as the engine struck Kelley.