# CHARLESTON.

JAMES WENDELL v. JOHN BARTON PAYNE, AGENT, ETC.

Submitted October 25, 1921. Decided November 1, 1921.

1. RAILROADS—*Ordinary Care Required as to Trespasser or Licensee.*

     A pedestrian using a railroad track for his convenience, unless at a public crossing, is a trespasser or licensee, and in

the operation of its trains the railroad company owes to him only ordinary care in avoiding injury to him. (p. 361).

2. SAME—*Negligence as to Pedestrian Seen on Track Held Jury Question.*

Where such pedestrian is injured by a light locomotive going at a rate of 15 to 20 miles per hour on a slight up grade and there is a substantial conflict in the evidence whether the injury could have been avoided by slowing down or stopping the locomotive after the injured person had been seen by the trainmen at a distance of 350 feet, the whistle sounded, and no heed given to the danger signal or approach of the locomotive by him, then it becomes a question for the jury to determine whether ordinary care has been used to prevent the injury. (p. 362).

3. RELEASE—*Question Whether Release for Personal Injuries Constitutes Accord and Satisfaction Held One for Jury.*

Where such pedestrian, being a deaf mute, is thus injured and while in the hospital a short time thereafter is approached by a claim agent of the railroad company and he then executes a release or acquittance for personal injuries, in consideration of payment of hospital services, without being able to read the release, and relies upon the representation of the claim agent that the paper signed is for the purpose only of making provision for payment of hospital charges, in order that he may remain in the hospital, it is error for the court to hold that such release will sustain a plea of accord and satisfaction; whether such release so obtained will sustain such plea is likewise a question for jury determination. (p. 365).

Error to Circuit Court, Mercer County.

Action by James Wendell against John Barton Payne, Agent, and from a judgment therein, the plaintiff brings error.

*Reversed and judgment here.*

*John R. Pendleton* and *A. M. Sutton,* for plaintiff in error.
*Williams, Lovall & Tunstall, McNutt, Ellett & McNutt,* and *Hall, Wingfield & Apperson,* for defendant in error.

LIVELY, JUDGE:

After all the evidence had been introduced defendant demurred thereto, the jury found a conditional verdict of $6,-250.00 in favor of plaintiff, the court sustained the demur-

rer, and entered judgment of *nil capiat*, and plaintiff brings error.

The action is for personal injuries sustained by plaintiff in March, 1919, while walking upon the track of defendant between the towns of Mullens and Corrinne in Wyoming County, by being struck by a locomotive.

Plaintiff was a deaf mute, sixty-four years of age, a painter by trade, and was on his way up the track to Corrinne, where he was engaged in painting dwelling houses. The track seems to have been used generally by pedestrians, the county road running parallel thereto being out of repair at that time and for about one year prior thereto. He was alone, walking at a brisk pace between the rails when struck, at about 7:30 o'clock in the morning. Witness Saxton was also going to Corrinne and was about 800 or 900 feet behind plaintiff, when the locomotive with tender attached (no cars) came from a "y" track which connected with another track across the river (a small stream at that place) and onto the track on which plaintiff was walking. Saxton, perceiving the approach of the engine from the "y", ran to the intersection of the "y" track with the main line, called the switch, and attempted to attract the attention of the man in the fireman's cab by motioning to him and then pointing ahead to plaintiff on the track, then 800 feet ahead, but was not sure that he attracted attention, stating that the man in the cab looked at him, the witness, and then looked up the track in the direction of plaintiff. The locomotive was going at about 25 miles per hour, according to this witness, and from 15 to 20 miles per hour according to those on the engine, the fireman, engineman, and an engine watchman who was "deadheading" to his work, and who was not a member of the engine crew. Witness Saxton testified that the engine proceeded to within about 350 feet of plaintiff when the whistle gave the danger signal of four or five short blasts in quick succession; that plaintiff paid no attention to the signal, being unable to hear, and proceeded as before and oblivious to the approach of the train, which did not decrease its speed. At the place where witness stood he could see the deaf man until the engine hit him, because the track curved slightly

to the left with a slight up grade.  He states that the engine did not slacken speed until a very short distance from plaintiff, when the brakes were applied, but too late.  He hurried forward and arrived just as the unfortunate man was being picked up.  This witness afterwards went upon the ground with an engineer in employ of defendant and pointed out and helped measure the distance from the switch, where he was standing when he attempted to attract the attention of the man in the cab, to the point where the danger signal was given, measured at 450 feet, and from that point to the place of accident, a distance of 350 feet, and a map of the track and surroundings is made a part of the record, showing these measurements and points.  The man in the fireman's cab, McGuire, who was a watchman, "deadheading" to his work, states that he did not see Saxton at the switch and of course did not see him motioning and pointing to the track ahead; but that after the engine had left the switch and had come to a curve of the track, a short distance therefrom, he saw plaintiff walking ahead between the rails, and, as soon as he "glimpsed" him, told the engineman that there was a man on the track.  He first stated that the man was then about 400 or 500 feet ahead, afterwards about 350 feet, and afterwards four or five car lengths ahead, stating that railroad men usually estimate such distances by car lengths and not by feet, and explaining that cars varied in length from 47 to 50 feet.  The engineman immediately blew the danger signals, and, he thought, checked the speed of the engine a little.  The fireman then came from where he was shoveling coal into the engine, and told the engineman that there was a man on the track; and then, as he remembered, the engineman put on the emergency brake and stopped as soon as possible.  The fireman, Long, stated that he was at the fire-box putting in coal when he heard McGuire say there was a man on the track, and immediately stepped up on the engine where he could see ahead and saw a man, about 100 feet ahead, as he guessed, and then he, the witness, told the engineman "that would do (referring to sounding the whistle) he would hit the man," and then the engineman put on the brakes, but he was not sure that he reversed the en-

gine. He said that when he looked out the window the man was about 100 feet ahead and that the engineer stopped the engine as quickly as he could. The engineer, Stull, stated that he did not see the man until after he had been hit, could not see him on account of the curve, but as soon as the watchman told him a man was on the track he blew the whistle, and "eased the brake up a little", and then when the fireman Long looked out of the window and said "I believe you will hit him," he put on the emergency brake, reversed the engine and put on sand, but by that time he hit the man and saw him fall to the right side. He said it was only a few seconds after the watchman had told him that there was a man on the track that Long looked out of the window and said the man would be hit. He estimated that at that time he was from 90 to 100 feet away from the man but would "hate to say" how far away he was; that he ran the engine about 50 or 60 feet past the place where the man was hit; that he could stop the engine in from 90 to 110 feet by the emergency and reversal of the engine when going at that speed, which the three men on the engine said was from 15 to 20 miles per hour. He gives no reason why he did not see the man when he came to the switch, when he was about 800 feet away. He was not asked that question, and possibly some obstruction was in the way to prevent. Both the watchman and the fireman knew plaintiff as a deaf mute, having frequently seen him at Mullens, but did not recognize him until he was hit by the engine. The engineman said he stopped his engine as quickly as possible after the fireman told him he would hit the man. Plaintiff stated that he had been on the track only a few minutes before he was hit, and sensed the approach of the engine just before it hit him; was surprised to see the engine near him and tried to get off, and had time to get off, "but train run faster when I tried to get off". Plaintiff's leg was broken above the ankle, two toes were mangled and were cut off by the surgeon, and the back of his head was severely cut. This latter wound was not of a permanent nature, but it appears that the injury to the leg is permanent and plaintiff will always be a cripple. The witness Saxton stated that the engine could have been

stopped two or three times in the distance from where the whistle was sounded to the place of the accident, basing his conclusion upon long observation of the starting and stopping of engines on the road and shifting cars on the yard. He had never worked on the railroad.

The defense is that the servants of the railroad company had discharged all the duties it owed to plaintiff, and under this evidence was not liable; and further that plaintiff had, by a writing sealed and witnessed, released all claim for damages in consideration of payment of the hospital and medical bills incurred by plaintiff. Plaintiff was first placed in the hospital at Mullens and a short time thereafter removed to a hospital at Beckley, and the release was signed about two weeks after the injuries were received, while plaintiff was in the hospital. He remained there until in July, when he was discharged.

There are two controlling questions presented. (1) Did the train crew use reasonable care to avoid the accident? (2) Did plaintiff release the railroad company from his claim of damages? Either of these questions answered in the affirmative will sustain the lower court.

First, we consider the evidence of the accident, and principles applicable thereto. A pedestrian, not an employee of a railroad company in the discharge of his duties, who uses the company's tracks for his convenience at any other place than at a public crossing, is a trespasser or a licensee, and cannot recover for injuries received by being struck by a locomotive unless the employees of the company operating the locomotive have failed to use reasonable care in the avoidance of injury to him after he is discovered. *Kelly* v. *Ry. Co.*, 58 W. Va. 216; *Blagg* v. *Ry. Co.*, 83 W. Va. 449. While it was gross negligence of this plaintiff to walk upon a railroad track where trains were likely to pass, and especially so because he had been cautioned not to use them, yet it was still the duty of the servants of the company to use the ordinary care. His great carelessness will not excuse theirs, if they failed to exercise reasonable care after discovering him. His carelessness or infirmity does not change

the rule of ordinary care on the part of the company, now well settled in this State.

It is also well settled that after discovering a trespasser or licensee on the track, it is the duty of those operating the locomotive to give warning of its approach in ample time and if there be no response to the warning, or anything about the licensee's actions indicating that he has not heard, or anything unusual in his demeanor reasonably suggesting that he is not in use of his facilities, and that he is making no effort to avoid the approaching danger, then they must bring the train under control, if possible, and avoid the injury. It would serve no useful purpose to review our numerous cases announcing these principles. The eye witnesses do not wholly agree upon these facts, as will be noted from the summary of their evidence hereinbefore set out; and the pertinent inquiry is whether those in control of the engine exercised ordinary care to prevent the injury.

What is the "ordinary care" to be used by the trainmen in cases of this character. It is said to be "such care as a prudent man of requisite skill will take under the circumstances of a particular case". But who is to decide that, under particular circumstances and conflicting testimony, ordinary care has been exercised? Where there is no conflict of testimony, buttressed by the physical facts, it may be proper for the court to determine the question; but such care is not to be laid down by a fixed rule and is not always easy to measure and ascertain, but, from its variable nature, depends upon the varying circumstances peculiar to each particular case, and it cannot always be determined as a matter of law. Especially is this true where there is a conflict of evidence in the decision of which men might reasonably differ. Hence the peculiar propriety of not withdrawing questions of this character from the jury. Is there a substantial conflict as to the reasonable care exercised in this case? Saxton says defendant was easily discernable from the switch where he stood, at a distance of 800 feet; but does not know if the men on the engine could have seen him. He says, however, that when the whistle sounded the alarm the engine was 350 feet from defendant, who plainly indicated that he

was paying no heed to the approach of the engine, that the speed did not slacken, and that the engine could have been stopped two or three times before it reached the deaf mute. The witness McGuire partially corroborates Saxton as to distance when the whistle first sounded. The engineman and fireman state they were much nearer when he was discovered. The fireman says they were about 100 feet away when he saw the man and told the engineer they were going to hit him. The engineer says he could stop within 90 to 120 feet; but after the fireman told him he would hit the man, he actually went from 50 to 60 feet beyond the place the engine struck him, making a distance the engine ran of 150 to 160 feet before it was stopped, after the fireman had so warned him. While the watchman was a "deadhead" and his negligence in not discovering plaintiff and giving the warning sooner can not bind the company, as he had no duty to perform, under our holding in *Bess* v. *Railway*, 35 W. Va. 492, yet he did notify the engineer that there was a man on the track, while they were yet 350 feet away, and as the engineer could not see because of the curve and boiler head, and had no responsible person to see for him, the fireman then being engaged at the firebox, it was his duty to bring his engine under control. He could not see if the man was apparently in possession of his ordinary facilities and was aware of the approach of the engine. The engineer was proceeding blindly, that is without being able to see the track ahead, and this fact called for caution. He was permitting this irresponsible passenger or "deadhead" to see for him. He says he "eased the brakes a little", but Saxton says there was no diminution in the speed. Under this evidence, can we say there is no substantial conflict? Had an unconditional verdict been rendered on this evidence in favor of plaintiff would it have been set aside as contrary to the evidence? Is not here a serious question of the exercise of "ordinary care" which should have been submitted to the jury? The principles governing here are tersely stated in *Raines* v. *Railway Co.*, 39 W. Va. 50, where it is said: "When a given state of facts is such that reasonable men may differ upon the question, whether there was negligence or not, the deter-

mination of the matter is for the jury. But when the facts
are such that all reasonable men must draw from them the
same conclusion—when there is- no room for two reasonable
opinions about it—then it becomes a question of law for the
court. The facts here place this case in a different class from
those of *Huff* v. *Railway Co.*, 48 W. Va. 45; *Blagg* v. *Rail-
way Co.*, 83 W. Va. 449; and other similar cases cited by
counsel for both plaintiff and defendants. In the Huff case
plaintiff was using the tracks in the yard as a foot way at
night and stepped out of the way of a passing freight train
onto a track leading into the round house where he was
struck by a yard engine backing into the round house. He
was not seen by the engine crew, no headlight was on the
tender and consequently no warning given. In the Blagg
case there was no evidence of when deceased came upon the
track, whether he was seen by the trainmen before he was
hit or what effort was made, if any, to avoid the injury, no
evidence whatever to show whether the engineer, by the ex-
ercise of ordinary care, could have avoided the injury after
discovering the deceased on the track. In the *Robertson Case*
87 W. Va. 106, 104 S. E. 615, the deceased was walking on
the track and was killed by a backing train on the rear of
which there was no watchman at the time of the injury, and
consequently he was not discovered, and no one knew the
exact details of the immediate accident, a case similar in
principle to the Blagg case. In the *Bralley Case*, 66 W. Va.
462, the deceased was on the track and drunk, and there was
evidence tending to prove that he came on the track and was
seen by the fireman in ample time to have given the engineer
warning of the danger. The fireman testified that the man
staggered suddenly upon the track about 200 feet ahead of
the engine and that he then gave warning but too late to
avoid the injury The engineer stated that he immediately
applied the brakes and did all in his power to stop after
seeing the man. Other evidence was to the effect that de-
ceased was staggering from side to side and plainly indi-
cated his drunkenness, and hence, that ordinary care was
not exercised. This court held that under such evidence the
motion to exclude and the instruction to find for defendant

were properly overruled, and the questions presented were properly jury questions; but reversed because of an erroneous instruction.

We are of the opinion that the evidence in the case now under consideration is of such conflict that the ordinary care required on the part of the engineman and fireman to avoid injury to plaintiff cannot be presumed to have been exercised as a conclusion of law, and that it was a question for jury determination.

We now come to the release of damages. Plaintiff was in bed in the hospital at Beckley, where the claim agent came to see him on the 19th of March, 1919, fifteen days after the accident, and the attending surgeon introduced the claim agent as such to plaintiff. The conversation carried on relative to the "company release" was by writing, the only way by which the deaf mute could communicate except by the use of signs. The notes of this transaction in writing were preserved by the claim agent and are in evidence, and it may be well to here incorporate the claim agent's testimony. "When I first went there, Doctor Coleman took me up and introduced me with this, he says, 'Mr. Counts wants to talk to you. He is claim agent for the Virginian Railroad.' Then I told him, 'I have been to the place you were hurt. Am sorry to find you this way. How did it happen, any way'. I don't think he made any reply to that only the motions of his hands, and I said, 'Train came around curve on you before you knew it?' and he said 'Yes,' and I said, 'How old are you?' and he said 'Sixty-two.' Then I said, 'Where were you going that morning',—'I was contracting for Corrinne Company. Twenty houses to paint. I had three men for me'. I said, 'We will take the best care of you we can and pay your bill here', and at that time I went down stairs, left him just for a minute, and went downstairs to Dr. Coleman's office, and I said, 'I will be back in a few minutes', and I went down stairs and came back, and I asked him, 'Where do you live, and have you any relatives?' and he said, 'I was raised in Philadelphia, Pa., and left home for Florida in 1886, didn't hear from them. I left Florida three years ago and come to Mullens', and I said, 'Well, you stay

89 W. Va.

here until you get well. We will take care of you the best we
can'. He said, 'Dr. Logan cut two toes off Mullens Hospital
five days'. I said, 'We will take care of your medical bill
as long as you need any attention, and I want you to sign
release for it, so our company will pay it for you', and he
said, 'I am goin'—I don't know just what's out there, I can't
read it, and I said to him, 'You must stay in the hospital
until you get well. Will you sign the release now?' and he
said, 'Yes, I will stay until I get well', and I said, 'We have
a piece of paper, company release, to be signed. Do you
want to sign it now?', and he said, 'Yes,' and I said, 'I have
this paper for you to sign. Then I told Dr. Coleman and
Logan to take good care of you and we would pay them',
and he says, 'I have been walking from Mullens to Bud,
Itman and all to Maben and all on Gulf. I always watch',
and he asked me, 'Do you live at Elmore?' and I said, 'No,
at Princeton', and I asked him, 'Where do you stay at Mull-
ens?', and he said, 'Mr. A. Smiley, White Kitchen'.'' Plain-
tiff says he did not read the printed part of the paper be-
cause he did not have his spectacles and could not read the
fine print. He could only read and did only read the part
written in by the claim agent. He says that he signed it
in order to be permitted to stay in the hospital. That was
all that was talked about, and when we refer to the written
statements above set out, we find that nothing was said about
the release of damages for the injury; they refer to pay-
ment of the medical bill. The claim agent's evidence on that
point is: ''I said, 'We will take care of your medical bill
as long as you need any attention, and I want you to sign a
release for it, so our company will pay it for you.' '' No-
where is there any mention made of a release for damages.
No suggestion of that character in the conversation leading
up to the signing of the release. The agent presumed that
plaintiff read the release before signing as he had it long
enough for that purpose. The injured man was 64 years old
and without his spectacles, and states that he did not and
could not read the printed portion, and signed in reliance
upon the agent's statement of the purpose of the execution
of the paper. The release has no more force or solemnity

than any other contract in writing; and whether the minds of the contracting parties met under these circumstances is a question for the jury. The presumption is that plaintiff read the release and knew its contents when he signed. This presumption can be rebutted. Whether the facts here are sufficient to do so, we need not say. The evidence is very persuasive that the old man did not know what was in the release and relied upon the information given him by the claim agent as to its contents. His future actions bear this out. We do not say that the agent fraudulently obtained his signature. The agent may have been under the impression that plaintiff read and fully understood the contents. We do say, however, that, under all these circumstances, the introduction of the agent as such by the surgeon; the writings concerning the medical bills, the interest of the parties, the pain and mental anxiety of the signer, his infirmity of hearing and speech, his age, and deprivation of spectacles, a jury question clearly arose, and the demurrer to this evidence should have been overruled. *Norvell* v. *Railway Co.*, 67 W. Va. 467.

Both of the controlling questions here presented, namely; that of the use of ordinary care by the servants of defendant to prevent injury to plaintiff, and that of the validity of the release, we conclude, should have gone to the jury. We therefore reverse the judgment and render judgment for the plaintiff on the demurrer to the evidence.

*Reversed and judgment here.*