# CHARLESTON.

KENNA K. HYRE, *Admr. etc. v.* C. L. BROWN *et al.,* TOWN OF
RAVENSWOOD, *Plaintiff in Error.*

(No. 5686)

Submitted October 12, 1926.   Decided November 9, 1926

1. MUNICIPAL CORPORATIONS—*Municipality Maintaining Electric
   Lighting Plant Has no Power to Construct Lines Beyond
   Corporate Limits and no Liability Attaches for Tort in so
   Doing (Charter of Town of Ravenswood, § 20; Code, c.
   47, § 28).*

   A municipal corporation owning, operating and maintain-
   ing an electric lighting plant under Chap. 47 of the Code,
   does not have power, expressed or implied, to construct lines
   beyond its corporate limits and thereby supply customers with
   electricity beyond such limits.   And if it does so, its act is
   *ultra vires,* and no liability attaches as for a tort in its
   commission. (p. 508).

2. SAME—*Municipality Can Exercise Only Powers Expressly
   Granted or Necessarily Implied, or Those Essential to Ac-
   complishment of Declared Objects of Corporation.*

   A municipal corporation possesses and can exercise only the
   following powers: (1) those granted in express words; (2)
   those necessarily or fairly implied in or incident to the powers
   expressly granted; (3) those essential to the accomplishment
   of the declared objects and purposes of the corporation—not
   simply convenient—but *indispensable.*   (Dillon on Mun. Corp.
   (5th ed.), Sec. 237.) (p. 518.)

3. SAME—*Power of Municipality Must be Denied Where There
   is Reasonable Doubt as to Existence of Power.*

   Where a fair, substantial, reasonable doubt exists as to
   whether such corporation is possessed of a power, the power
   must be denied. (p. 518.)

Error to Circuit Court, Jackson County.

Action by Kenna K. Hyre, administrator of one Ander-
son, deceased, against C. L. Brown and the Town of Rav-
enswood.   Judgment for plaintiff against the last named
defendant, and it brings error.

*Reversed; verdict set aside; remanded.*

*M. C. Archer* and *Harper & Baker,* for plaintiff in error.

*Lewis H. Miller, J. L. Wolfe, W. F. Boggess* and *S. P. Bell,* for defendant in error Brown.

*T. J. Sayre, Kenna K. Hyre* and *L. C. Somerville,* for defendant in error Hyre.

Lively, Judge:

This writ of error is to a judgment on a verdict of $5,500.00 in favor of plaintiff against the Town of Ravenswood for the death of plaintiff's intestate caused by the alleged negligence of defendant in the operation of its municipal electric lighting plant.

Anderson, about 19 years old, plaintiff's intestate, had left Ravenswood about 7 o'clock A. M. December 12, 1922, riding a brown mare and leading a bay horse by a halter, going to his work with road construction contractors as a teamster. Shortly afterwards he was found dead in the public road, lying with his face partly submerged in a ditch of water on the west side of the road. The horse was lying near him, also dead, and the mare was about forty feet beyond in the direction he was traveling, lying partly in the same ditch but not dead. In his left hand, which was also submerged in the ditch, Anderson grasped what one of the witnesses said was a live wire, while another witness said it was a stray wire from four to six feet long. Along the road on the west side in a field was an electric line; between it and the road was a fence over which briars, weeds and bushes had grown. Then there was a narrow strip of grass land between the fence and the ditch where Anderson was found. A severe rain and wind storm had occurred the night before, and an electric wire heavily charged with electricity, had been broken, presumably by the violence of the storm, and one end had fallen on the bushes and probably extended over to the ditch. Pyatt, a witness who first reached the scene of the tragedy, detecting the presence of electricity when he approached Anderson's body, gave instructions to some persons near the town to have the electric plant in the town shut down. The cur-

rent was then turned off, and the horse got out of the ditch and walked off. The body of Anderson was removed from the ditch with the wire in his left hand, or, as one witness said, hanging to his clothes. His hand was severely burned, and there were burned places on his body wherever there was the presence of a metallic substance in his clothing. The evidence indicated that Anderson had dismounted; that the horse had walked ahead until he came near the ditch several paces ahead. The evidence also indicated that the line was broken by coming in contact with a telephone pole standing between the road and the fence. The electric current came from an electric plant maintained and operated by the municipality, and was on a line leading from the corporate limits of the town to the dwelling of C. L. Brown about one-half a mile to the north of the town limits. The two-wire system leading from the corporate limits to Brown's house carried 2200 volts of electricity. At Brown's house a transformer reduced the voltage to 110 volts which was metered at his house, and for which electricity he paid monthly.

The suit is against the town and Brown jointly. The first count in the declaration says that the town owns the plant and negligently and carelessly permitted the current to go over the line which had been and was improperly and negligently constructed and maintained by Brown. And that the town was also negligent in not having its plant properly equipped with a device for detecting grounded wires, or if it did so, was negligent in not shutting off the electricity when the wire was grounded. The second count is a variation of the negligence charged in the first. The third count charges that the line from the plant to Brown's house is jointly owned and maintained by Brown and defendant; that it was out of repair, and that the town negligently sent a heavy voltage over it knowing its unsafe condition; and that it fell in the public road, causing the death. Demurrers were interposed to the declaration and to each count, and were overruled (except to the fourth count, not in question here); the issues made up, and at the

close of the evidence the court directed a verdict for Brown. The jury returned the verdict and answered special interrogatories prepared by the town.

In the trial a controversy arose between the co-defendants as to which of them constructed and maintained the lines leading from the corporate limits to Brown's house. The trial judge concluded that the controversy between the defendants was unimportant, holding that if the line was in fact out of repair and negligently constructed, defendant town was guilty of negligence in permitting the electricity in dangerous·voltage to go over it; and that its failure to shut off the current when the wire was grounded was the proximate cause of the death. Therefore, he held that the town was primarily liable as the proximate cause, and instructed the jury to find for defendant Brown. The dismissal of Brown is one of the numerous alleged errors complained of by appellant town.

Appellant took the position in the trial and now asserts here that it was not liable, because the accident occurred outside the corporate limits and it, the town, in sending its current over the wires beyond the corporate limits was going beyond its power and authority, and the act was ultra vires. It contends that the evidence of the injury was inadmissible against it in toto.

The charter of the town, Chap. 51, Acts 1868, does not expressly give it the power to provide for lighting the streets or furnishing light to the inhabitants. An electric light plant was unknown. But Chap. 47 of the Code which does provide that the municipal authorities may erect and authorize or prohibit electric light works in the City (Sec. 28), also provides in Sec. 1 that the powers therein given shall be deemed an amendment to the charter of any city, town or village, except the City of Wheeling.

The charter does give the city power to erect, authorize or prohibit the erection of gas works or water works in or near the town. It is quite generally held that an express authority to light the streets, by necessary implication gives power to light the same by any means the municipality may

employ. Note to *Posey* v. *North Birmingham,* 15 L. R. A.
(N. S.) 711. And the weight of authority seems to be that
under such charters the municipality may also furnish light
to its inhabitants. Idem page 713; 19 R. C. L. 791, Sec. 97.
That the town in manufacturing and furnishing electricity
for a consideration to consumers, is performing a function
not governmental and is therefore liable for negligence in
carrying on its work in that regard, is not seriously
controverted. *Wigal* v. *City of Parkersburg,* 74 W. Va. 25,
and *Warden* v. *City of Grafton,* 99 W. Va. 249, strongly
militate against the contention that such undertakings are
governmental. When the city furnishes light and power to
a consumer for a consideration, it could scarcely be said
that it was carrying on a purely governmental function.
The point stressed, and to be decided is, that although the
operation of the electric light plant and the furnishing of
light to domestic consumers is not governmental, and there-
fore renders the city liable for its negligence in so doing, it
has no express or implied power to go beyond the city lim-
its and furnish power or light to any person for any purpose.

Many of the cases cited by the town to show that its act
in furnishing Brown with light one-half a mile from the
corporate limits, was ultra vires, and therefore exempt-
ing it from all liability, are where the charter powers did
not include the right to engage in the business out of which
the negligence grew. *Donald* v. *Harrisonburg,* 104 Va. 533;
*Radford* v. *Clark,* 113 Va. 199, and *Duncan* v. *City of Lynch-
burg,* 34 S. E. 964, hold that the charters did not give the
municipalities power to own and operate rock quarries in
or out of the city limits. And hence the city was not liable
whether such quarries were operated in or out of the city.
Likewise, in *Posey* v. *North Birmingham* (Ala.), 15 L. R. A.
(N. S.) 711, and in *Becker* v. *La Crosse,* 99 Wis. 414, it was
held that the city in the first case had no authority to erect
a power plant for lighting, and in the second case that the
city was without authority to go into another state and
build a road which entered the city over a bridge. Prac-
tically the same holding is in *County Court* v. *Piedmont,* 72

W. Va. 296. In *Krutili* v. *Board,* 99 W. Va. 466, cited by plaintiff in error, recovery was denied because the board was exercising a purely governmental function. However, the *Georgia* cases cited, more especially *Mayor of Gainesville* v. *Dunlap,* 147 Ga. 344, hold that a municipality operating water works and furnishing water to consumers does not give it power or right to furnish water to a person outside the city limits, and its acts in so doing, without express or implied power in its charter so to do, are ultra vires. And in *Farwell* v. *Seattle,* 43 Wash, 141, 10 Am. & Eng. Ann. Cas. 130, it was held that while the statute gave the municipality authority to furnish its inhabitants and *any other person* with an ample supply of water, it did not give the city power to contract to furnish a supply of water to another municipality.

It is very well established that a municipality without statutory authority express or implied cannot exercise its powers beyond its corporate limits. This principle applies to municipalities which operate water works for the needs of its inhabitants. Dillon on Municipal Corp. (5th ed.), Sec. 1299, citing among other cases, *City of Paris* v. *Sturgeon,* 50 Tex. Civ. App. 519, wherein it was held that the general act incorporating cities and giving them power to provide water works in or out of the city, did not give the city power to supply water to a person outside of the city limits. *Stauffer* v. *East Stroudsburg,* 215 Pa. 143, and *Haupt's Appeal,* 125 Pa. 211, hold the same. In *Lawrence* v. *Methuen,* 166 Mass. 206, the principle is recognized. The charter of the municipality of Methuen gave it the right to contract for delivery of water to any person, and the court assumed that such person must be a property owner in the town. The water was delivered within the corporate limits to the Arlington Mills, a company which had part of its plant in the town, and which conveyed the water or a portion of it to that part of its plant beyond the corporate limits. In the case at bar Brown was not an inhabitant of the city, nor was the electricity delivered to him on property owned by him in the city. The New Jersey court in *Town of Kearney* v. *Mayor,*

*etc., of City of Bayonne,* 107 Atl. 169, said: "It appears to be the well-established rule that power in a municipality to furnish water to its inhabitants must be rested upon direct legislation (19 Ruling Case Law, title, Municipal Corporations, Sec. 96, P. 788), and that the grant of power generally to provide a water supply for the inhabitants of a municipality does not carry with it the right to furnish water to inhabitants of other territories," citing many cases.

If defendant town had no authority express or implied to send its electricity out of the city limits for lighting purposes to a non-resident of the city, its act in so doing was *ultra vires,* and it is quite generally held that the municipality is not liable for torts in connection therewith. 6 McQuillin on Munic. Corp. Sec. 2637; *Dilluvio* v. *City of N. Y.,* 132 N. Y. Supp. 531. However, the defense of *ultra vires* can be interposed only where the act complained of was wholly beyond the powers of the municipality. 6 McQuillin Munic. Corp. p. 5439, Sec. 2637. Dillon on Munic. Corp. in Vol. 3 (5th ed.), Sec. 1300, says that a municipality which owns, operates, and maintains its own electric plant which generates a *surplus* of electricity beyond the requirements of the city and its inhabitants, may contract with private persons for the use of the surplus, so long as it does so without affecting the supply required for public or quasi public purposes; and within this principle it may extend its electric service beyond the city limits, if in so doing it does not impair the usefulness of the plant in fulfilling the primary purpose for which it was created He cites as authority the case of *City of Henderson* v. *Young* (Ky.), 83 S. W. 583. The city in that case proposed to furnish electricity to consumers beyond the corporate limits. An injunction was sought to prevent it from doing so, on the ground that it had the power only of furnishing the city and its inhabitants, under its charter and the statute. The Kentucky court held that the city was not performing a governmental function in furnishing light to its inhabitants but was engaged in a business for private advantage to the city and its inhabitants, and could sell its *surplus* current beyond the city

limits, as incidental to its private business, which business it might conduct in the manner which promised the greatest benefit to the city and its people. The case of *Rogers* v. *City of Wickliffe,* 29 Ky. L. Repts. 587, 94 S. W. 24, holds that a city when supplying water for private purposes is acting as a business corporation and may contract to supply water beyond the city limits, if there be sufficient supply left for the residents of the city. In *State* v. *City of Eau Claire,* 40 Wis. 533, it was held that the city might lease for private purpose any excess of water not required for city purposes. But the statute authorized it to do so. And the recent case of *McDonald* v. *Ward,* 77 So. (Ala.) 835, says the *excess* of electrical power produced from a municipal lighting plant may be disposed of to private persons, citing and following the *Kentucky* cases. However, the private persons appeared to be within the city limits.

The implied power of municipalities which operate electric lighting and power plants and water works, to sell light, power, heat and water for private purposes, is based on a surplus of the commodity on hand, and that the sale of that surplus will not impair the main purpose. *MacDonald* v. *Ward, supra; Henderson* v. *Young, supra; Board* v. *City of Ft. Collins,* 189 Pac. (Col.) 929; *Milligan* v. *City of Miles et al.,* 153 Pac. (Mont.) 276; *Colorado Springs* v. *Colorado City,* 42 Col. 75, 94 Pac. 316; *Farwell* v. *Seattle,* 43 Wash. 141, 86 Pac. 217, and many others that could be cited. See Pond on Public Utilities (3rd. ed.) Sec. 20. A city in furnishing such commodities acts in its proprietary or business capacity as distinguished from its governmental functions and powers. Many of the cases are where the excess commodity was furnished to residents inside of the corporate limits; and it seems to be rather generally conceded that the city may dispose of its excess electrical energy, water power or other like commodity manufactured or controlled by it, within its corporate limits. Its powers as a governmental body or its proprietary activities, as a general proposition, are confined to its corporate limits, unless the charter or law governing it extends these powers beyond, either by express grant or by necessary implication.

It is well to remember that the question we have here is, granting that the town had the power, express or implied, to furnish electric light to its inhabitants, which it undoubtedly had, does it have power to extend its lines and conduct its business outside of the town to supply customers? If extended to Brown, can it extend farther and serve the general public? It will be observed that these decisions that it may do so are based largely on the proposition of an excess of the commodity beyond the use of the city's needs; and having such surplus, it would be for the general corporate welfare to dispose of it in order to keep up the plant and reduce taxation. One of the cases naively says that the city may make "two blades of grass grow where one formerly grew." In the case at bar there is no suggestion of surplus electricity on hand. Neither the cost and capacity of the plant, the power generated, the consumption in the city, the revenues derived therefrom, nor the cost of maintaining the plant, are shown. It is not shown what induced the town to supply Brown, and build the line, if, in fact, it did build the line. It has been furnishing him light for his dwelling and outhouses since about 1902 or 1903.

In *Farwell* v. *Seattle, supra,* 43 Wash. 141, 86 Pac. 271, decided in 1906, the city purposed to furnish water to an adjoining municipality, thus necessarily going beyond its own corporate limits to do business, and was entering into a contract to do so when it was enjoined. The precise question is the one we have here, the power of a city to furnish a commodity to consumers beyond its corporate limits. The charter gave the city power to maintain water works within or without the city, to supply the city and its inhabitants with water. It appeared that the city relied on a statute defining the powers of cities to construct and operate waterworks which confined the purpose to the furnishing of such city or town and the inhabitants thereof and *any other persons* with an ample supply of water. The court said that it would not interpret the words "any other persons" to mean that the legislature intended to extend extra-

territorial powers. The language of Justice Hadley in rendering the opinion is so apropos to the case in hand that we are persuaded to quote it: ''A municipal corporation is limited in its powers to those necessarily or fairly implied in or incident to the powers' expressly granted, and also to those essential to the declared objects and purposes of the corporation. 1 Dillon Mun. Corp. (4th ed.) sec. 89; 1 Smith on Modern Law of Mun. Corp. Sec. 562; *Los Angeles City Water Co.* v. *City of Los Angeles* (C. C.) 88 Fed. 720. It is a general principle that a municipal corporation cannot usually exercise its powers beyond its own limits, and if in any case it has authority to do so, it must be derived from some statute which expressly or impliedly permits it. *Coldwater* v. *Tucker,* 36 Mich. 474, 24 Am. Rep. 601. The doctrine of ultra vires is applied with greater strictness' to municipal bodies than to private corporations. 1 Smith on Modern Law of Corp. Sec. 661. Upon this subject the Supreme Court of Minnesota has said: 'A different rule of law would in effect vastly enlarge the power of public agents to bind a municipality by contracts not only unauthorized but prohibited by the law. It would tend to nullify the limitations and restrictions' imposed with respect to the powers of such agents and to a dangerous extent expose the public to the very evils and abuses which such limitations are designed to prevent.' *Newberry* v. *Fox,* 37 Minn. 141, 33 N. W. 333, 5 Am. St. Rep. 830.''

Even where there is direct legislative authority for a municipal corporation going beyond its corporate limits to conduct a public service business, the extra-territorial power thus conferred is strictly construed. *Borough of East Newark* v. *New York &c.,* 57 Atl. (N. J.) 1051; *Rehill* v. *East Newark,* 73 N. J. L. 220, 63 Atl. 81.

Counsel for plaintiff below relies upon *Salt Lake City* v. *Hollister,* 118 U. S. 256, 30 L. Ed. 176, which was an action by the city to recover taxes actually, though voluntarily, paid to the government, assessed and levied upon the city as a distiller of liquors, on an excess of liquor produced but not reported, on the ground that it, the city, was without

authority to engage in the business of a distillery, and was therefore performing an *ultra vires* act. Recovery was denied. The opinion seems to hold that although the city in carrying on a distillery was doing an act wholly and necessarily outside of its powers, either general or special, and which was clearly *ultra vires* in the strongest meaning of that phrase, yet it would be liable in tort for the acts of its agents in the course of the unauthorized business. In commenting upon that decision in note to Sec. 1654 of Dillon on Mun. Corp. (5th ed.) p. 2878, it is said that the decision did not rest upon such a broad basis, and the observations of the court should be limited accordingly. If not limited, the criticism goes on to say, "it would be, as it seems to us, an extension of the doctrine of liability of municipal corporations for *ultra vires* acts beyond the limits heretofore and generally recognized, since such extended liability would appear to rest upon a supposed estoppel created by the mere fact of conducting an *ultra vires* business, and this in the face of the limitations imposed by the charter of the city upon its corporate powers. Such a view, if sound as respects private corporations, would seem not to be so as respects municipal corporations, whose powers are defined and limited for the express purpose of protecting the inhabitants from just such liability. Cases within the apparent or possible powers of the municipality, where the other party acted in good faith and had no reasonable means of protecting himself from loss or damage, may stand upon different grounds." It seems to us that if the observations of the court in that case are followed literally, a municipal corporation could scarcely escape liability either in contract or tort, even though its act was clearly *ultra vires* in the strongest sense. There would be little use in limiting the powers of a city for the protection of its citizens and taxpayers. We are disposed to follow the established rule that if the alleged tort is in connection with an act which is wholly *ultra vires,* no liability for damages arises against the municipality. McQuillin says that no state, except possibly Iowa, has followed *Salt Lake City* v. *Hollister.* And it

appears that Iowa followed the general rule above stated, in *Field* v. *Des Moines*, 39 Ia. 575, 18 Am. Rep. 46. See Vol. 6 McQuillin on Mun. Corp. p. 5440, Sec. 2637.

So, it will be observed, the decisions are not altogether in accord—a not unusual situation. The *Kentucky* cases and the *Alabama* case are to the effect that because the municipality is engaged in a business not governmental in its character and has an excess of a commodity, it has implied power to extend its business beyond its corporate limits. The general rule above stated is that a municipality cannot exercise powers beyond the city limits without express or implied grant. Many cases hold that where authority is given to supply a commodity beyond the city limits, the immediate and contiguous territory is meant. If an excess of a commodity beyond city needs gives implied power to market it outside, it is difficult to perceive why that market should be limited. The limit of territory would be measured by the excess of the commodity. If a city had a large plant producing light or power in great excess of its needs, it could enter the light and power business outside in competition with private companies, a result not reasonably contemplated by the lawmaking power in the creation of municipal organizations. The inhabitants of a city are entitled to the protection the charter and laws give them. The extension of electric lines outside of the corporate limits would necessarily increase the hazards and risks to which the inhabitants would not be subjected otherwise, entailing increased taxation. Not only would they be subjected to risks for damages, as in this case, but would be subject to risks of mismanagement and consequent loss as a business proposition. Municipal management is not always as alert and capable as private management and ownership. The officers of a municipality are constantly changing, and their selection is not always based on their fitness to operate a public service utility. While the business is confined to the city limits, more intensive observation of the instrumentalities used and the conduct of the business may be had by the inhabitants, and by the city itself through its policemen

and other officers. In the cases which give implied power to go outside on account of excess or surplus in the commodity produced, the element of loss as a business proposition is negligible. The general rule based on logic and experience is that a municipality has no power beyond its corporate limits, without legislative authority express or implied, that its acts in so doing without express or implied authority are *ultra vires;* and no liability attaches in carrying out such acts. *Town of Kearney v. Mayor, Etc., of City of Bayonne,* 107 Atl. (N. J.) 169; Dillon on Mun. Corp. (5th ed.), Sec. 237; 28 Cyc. page 280. "Such bodies' will not be permitted to assume powers and incur liabilities in derogation of the expressed intent of the legislature, and in violation of the rights of the inhabitants, who may have become members of the corporation without their consent. It is accordingly well settled that when a municipal corporation undertakes a function not delegated to it by the legislature, it is not liable for negligence or misconduct in the performance of that function." 19 R. C. L. Sec. 414, pages 1137-8. The exception to the general rule is that there is implied power to furnish an excess commodity to outsiders where the city has such commodity in the exercise of an authorized proprietary undertaking, under the theory that it is "good business". The instant case does not fall with the exception noted, for there is no suggestion herein of surplus .commodity, or "good business".

Anderson's administrator (defendant in error) relies upon the proposition that the town is liable for the tort even though its act was *ultra vires,* citing *Salt Lake City* v. *Hollister, supra,* which we have hereinbefore discussed; and upon the further proposition that the town was expressly authorized to conduct governmental and proprietary functions outside of the corporate limits, under its charter of 1868, which says the town may "erect, or authorize or prohibit the erection of gas' works or water works in or near the town; to prevent injuries to or pollution of the same, or danger to the water and healthfulness of the town; for all which purposes, except that of taxation, the council shall

have jurisdiction for one mile beyond the corporate limits of said town."

This provision just quoted is found in Section 20 of the. charter which defines the powers of the council with reference to streets, public grounds, abatement of nuisances, cemeteries, fire prevention, annual assessments; election of officers and their terms, powers and duties; establishment and regulation of markets, and protection of divine worship. And it is argued that for all these purposes the town has two corporate limits, one defined by the act by metes and bounds; the other by a distance of one mile from those stated by metes and bounds, except in the latter the town shall have no power of taxation. It would be a strained and unnatural construction to give, by virtue of the provisions of the words quoted, jurisdiction to the town for one mile beyond its stated limits, with the power to construct streets, prevent fires, elect officers, and the like. Properly construed, the jurisdiction "one mile" relates to the erection of gas and water works and the prevention of injuries to or pollution of the same, or danger to the water and healthfulness of the people in the town. By this provision we can see no express or implied power by which the town council would be authorized to furnish water or electricity to persons without the corporate limits, or to engage in a business for supplying the community generally with water, gas, electricity or power. Dillon in Sec. 237, (5th ed.), in his excellent work on Municipal Corporations, says a municipality can only exercise: (1) those powers granted in express words; (2) those necessarily or fairly implied in or incident to the powers expressly granted; and (3) those essential to the declared objects and purposes of the corporation—not simply convenient—but *indispensable*. And he says that, "Any fair, reasonable, substantial doubt concerning the existence of power is resolved by the court against the corporation, and the power is denied," citing numerous authorities. And in *Wallace* v. *City of Richmond*, 26 S. E. (Va.) 586, it is said: "Where a doubt exists as to whether or not a municipal corporation may exercise a particular power, that doubt must, under the rule requiring a

strict construction of such instrument, be solved by deny-
ing the existence of the power." We think there is little
doubt that the legislature did not intend to give the town
power to engage in general business outside of the corporate
limits defined by metes and bounds.

We can find no authority express or implied which war-
ranted the town in constructing the line to Brown's resi-
dence, and in furnishing him electricity there and to his out-
houses. It was an *ultra vires* act for which the inhabitants
of the town cannot be mulcted in damages for torts commit-
ted in connection therewith.

It was error to refuse to instruct the jury to find for the
plaintiff in error.

Obviously the other errors assigned are of no importance.
There is no cross-error assigned by defendant in error.

The judgment will be reversed, the verdict set aside, and
the case remanded.

*Reversed; verdict set aside; remanded.*