STATE OF WEST VIRGINIA *ex rel.* TOWN OF SOUTH

CHARLESTON, *A Municipal Corporation, et al., etc.*

*v.*

IRA J. PARTLOW, ATTORNEY GENERAL, *et al.*

(No. 10145)

Submitted April 13, 1949. Decided July 6, 1949.

140

HAYMOND, PRESIDENT, RILEY and FOX, JUDGES, concurring.

*Bowers & Meador, P. G. Meador,* for petitioners.

*Ira J. Partlow,* Attorney General, *Eston B. Stephenson,* Assistant Attorney General, for respondent.

*Charles C. Wise,* for Board of Education of Kanawha County, a statutory corporation, an intervenor.

LOVINS, JUDGE:

The Attorney General of the State of West Virginia disapproved a proposed bond issue of the Town of South Charleston in the sum of eighteen thousand, five hundred dollars, authorized by the voters of said town on November 5, 1946. The Town of South Charleston, hereinafter designated as the "town", and a resident and taxpayer thereof, filed a petition in this Court seeking a review and reversal of the action of the Attorney General. This Court granted the review.

The Board of Education of the County of Kanawha, hereinafter referred to as the "board" was given leave to intervene in this proceeding.

Eighteen thousand dollars of the proceeds of said proposed bond issue is to be used for the purchase of an improved parcel of land, now owned by the United States of America. The tract of land is described as all of Lots Nos. 9 and 10, the westerly five feet of Lot No. 8, and the east-

erly seven feet of Lot No. 11, Block E-3, of the town. This land was formerly owned by the board. On June 10, 1941, the board conveyed Lots Nos. 9 and 10, and the westerly five feet of Lot No. 8 aforesaid to the town, and released to the town its interest in the easterly seven feet of said Lot No. 11. The consideration for such conveyance and release was nominal.

The town agreed with the board that it would endeavor to secure the erection of a recreation building and other improvements on said land, and that, in the event the land was not acquired by the United States of America, the town would execute and deliver a lease in "language identical with or substantially the same as the lease * * * [thereto] attached". The agreement further provided that if the United States of America should acquire title to said land and reconvey the same to the town, the town would execute a similar lease to the board for a term of ninety-nine years, with the privilege of renewals for two like periods. It is unnecessary further to state the terms, stipulations and provisions of said agreement.

A proceeding in eminent domain was instituted by the United States of America, in the United States District Court for the Southern District of West Virginia, which resulted in the United States of America acquiring the title to said land for the sum of one dollar. The arrangement between the town and the board was recited in an order of the court entered in the eminent domain proceeding. But it was provided in such order that the agreement or arrangement should have no effect on the title acquired by the United States of America.

Thereafter the Federal Government erected a building on the land. The town leased the land and improvements from the Government. Whether the town still occupies said land and improvements, as a tenant, is not clearly shown.

Subsequent to the conveyance to the town and the agreement between the town and the board, a new ad-

ministration was elected for the Town of South Charleston, and, according to the record, the members of the new administration were not apprised of the agreement between the town and the board. On September 30, 1946, an ordinance was adopted by the council of the town submitting the bond issue to the voters thereof. The money derived from the sale of the bonds was to be used in purchasing the land and improvements from the Federal Government. During the pendency of such election, officials of the town were advised of the conveyance from the board to the town, and the agreement to lease the property in the event the town reacquired ownership thereof. On October 23, 1946, a statement was made and published by the town officials to the effect that they had no intention to purchase the land and improvements, if the transaction between the board and town was binding and valid, but such statement was not submitted to the voters in the ordinance calling the election. The bond issue was authorized by the voters of said town. No defect is set forth in the record relative to the procedure in calling the bond election, in submitting the question to the legal voters of the town, and in ascertaining the result of said election.

The facts hereinbefore stated were before this Court in the case of *Town of South Charleston v. Board of Education*, 132 W. Va. 77, 50 S. E. 2d 880, and reference is made to the opinion in that case for a statement of additional facts considered in this proceeding.

The Court held in the case of *Town of South Charleston v. Board of Education*, 132 W. Va. 77, 50 S. E. 2d 880, that the subject matter of the controversy was not before the Court; that there was no jurisdiction to grant relief under the Declaratory Judgments Act; and, further, that the parties to that suit were relying upon contingent and future events which could not be considered. Accordingly, said declaratory judgment suit was dismissed.

After the dismissal of said declaratory judgment suit, the validity of the bond issue was submitted to the Attorney General of this State, in accordance with the provi-

sions of Code, 13-1-25. For some reason not clearly shown, the papers showing the transactions between the board and the town relative to the land and improvements were included among the papers submitted to the Attorney General. Upon consideration of the agreement and deed executed by the board and town, the Attorney General was of opinion that the agreement, not having been declared invalid by a court of competent jurisdiction, should be treated as valid; that the money raised by the bond issue could not be legally expended for the purchase of the land and improvements hereinabove mentioned; and that the proceeds of the proposed bond issue must be expended for municipal purposes and not for recreational or educational purposes controlled by the board. Counsel for the town and petitioner contend (1) that the deed and agreement executed by the town and board are invalid; and (2) that all rights, interest, and estate, if any, the board may have had in the land and improvements were extinguished by the judgment in the eminent domain proceeding above mentioned. The board contends: (1) that the deed executed by it to the town and the agreement to lease the land and improvements are valid and binding by reason of the statutory rights conferred on the board and town by Chapter 105, Acts of the Legislature, 1945; (2) that the town has no equity in the land and improvements and seeks to repudiate the agreement of October 10, 1941; and (3) that the bond issue is invalid on account of the statement made by the officials of the town after the election had been called.

Notwithstanding the written statement of the Attorney General, the contentions of the town, and the contentions of the board, we are of opinion that only two questions arise in this proceeding: (1) May the validity of the deed and agreement between the board and the town and their respective rights to the lands and improvements, if any, be determined in this proceeding; and (2) is the bond issue, when separated from the expenditure of the money raised thereby, valid?

A review of a proposed bond issue by the Attorney General of this State, and a further review of the action of that official by this Court, are entirely statutory. It would serve no good purpose to cite cases from other jurisdictions relative to similar questions.

The provisions of Code, 13-1-25, direct "the governing body of any political division issuing bonds under this article", after the ascertainment of the result of a bond election, to submit to the Attorney General certified copies "of all orders, ordinances, proclamations, affidavits, resolutions and records of all of the proceedings connected with or pertaining to such bond issue, and any other matters relative thereto which the attorney general may require."

Assuming that a proposed bond issue is for a purpose authorized by law, the power of the Attorney General in approving or disapproving the validity thereof, pursuant to Code, 13-1-25, is restricted to passing upon the procedural steps taken by the political subdivision: (1) in submitting the question of the issuance of the bonds to the electorate; (2) in ascertaining the result of an election held for the purpose of authorizing or rejecting the proposed bond issue; and (3) in the passage and adoption of such resolutions, ordinances or orders, including those providing for the form of the bonds, as may be necessary to effectuate the will of the electorate expressed at such election. We do not think that the question of the expenditure of the money raised by a bond issue should be submitted to the Attorney General or passed on by him. This being true, we can see no purpose in the Attorney General reviewing the actions of the town and the board relative to conveying the land and making the agreement above referred to. Those questions properly come before a duly constituted court, having judicial power conferred by the constitutional provision reading as follows: "The judicial power of the State shall be vested in the supreme court of appeals, in circuit courts and the judges thereof, in such inferior tribunals as are herein authorized and in justices

of the peace." Article VIII, Section 1, Constitution of West Virginia.

If the deed executed by the board to the town and the agreement to lease executed by the town and the board are invalid, a court possessing judicial power may declare such invalidity. We find no constitutional or statutory provision authorizing the Attorney General to pass on such questions. We therefore think that the review of the Attorney General in this instance should be confined to the procedural steps above mentioned.

The jurisdiction of this Court to review the action of the Attorney General in approving or disapproving a proposed bond issue rests solely on Code, 13-1-26, and should "be proceeded with as in cases of original jurisdiction". Eliminating any questions with respect to the division of power provided by Article V of the Constitution of this State, this Court has held: "The Legislature may, within constitutional limitations, enlarge by statute the jurisdiction of this Court so as to authorize us to control the action of executive or administrative officials, not including the governor, in all purely ministerial or administrative matters, not involving discretion, but depending on the application to the facts of positive law and correct legal principles." *State v. England,* 86 W. Va. 508, 103 S. E. 400. In *State v. England, supra,* the Court did not characterize the powers of the Attorney General under Code, 13-1-25, as being judicial or ministerial, but used the following language with reference thereto: "But do his [Attorney General's] duties involve purely judicial action or discretion? Manifestly, the legislature did not so determine. The purpose was to make his duty supervisory and ministerial, although calling for his opinion and judgment on the law. His duties in this respect are not different from almost any other ministerial or executive officer." See: "Judicial Review of Administrative action", 44 W. Va. Law Quarterly 270, 350, 357.

The questions sought to be reviewing in this proceeding are not within the scope of the review authorized by Code,

13-1-26, and generally may be determined only in a plenary suit, properly brought, considered and determined in a constitutional *nisi prius* court.

We think the review by this Court of the Attorney General's action, contemplated by Code, 13-1-26, is limited to his actions with respect to the powers he may properly exercise pursuant to Code, 13-1-25, as hereinbefore stated, and to no others.

The validity of the deed from the board to the town and the agreement to lease executed by them was not properly before the Attorney General. The rule adopted by this Court, restricting the review under Code, 13-1-26, is stated in the third point of the syllabus of *Baxa v. Partlow,* 132 W. Va. 859, 54 S. E. 2d 825 (decided June 1, 1949, and not yet reported), as follows: "Ordinarily the sole question to be considered upon the review provided for in Code, 13-1-26, is the approval or disapproval, by the attorney general of a proposed bond issue; and generally this Court will not undertake therein the supervision of the expenditure of funds to be procured as the result of such bond issue." In exercising the statutory authority to review the action of the Attorney General, this Court should not extend the scope of its review to include questions *de hors* the bond issue which should be determined in the first instance by a trial court having judicial power under our organic law.

The title to the land in question is not before the Court in this proceeding. It was held in the case of *Town of South Charleston v. Board of Education, supra,* that the subject matter of the litigation was not before the Court, and that there was no jurisdiction to grant relief under the Declaratory Judgments Act. A *fortiori,* the title to said land is not before the Court in this proceeding, and we should not pass upon any question connected with it. This Court should not co-mingle the claimed equities and property rights of the town and the board with questions arising in a restricted statutory review.

In view of the foregoing we express no opinion relative to the rights and equities asserted by the town and the board in this proceeding, and remit them to their remedies, if they are so advised, to be enforced in a proper suit, in which such questions are properly presented.

The statement made by the town council on October 23, 1946, with reference to the intention of the officials of the town not to purchase the land for use by the board of education, has no bearing on the validity of the bond issue. That was something outside the submission set forth in the ordinance published, as required by statute. The voters of the town did not vote on the informal statement made by the town council on October 23, 1946; but did vote on the question submitted to them by the ordinance as first published. Said statement was only published as a matter of information. We are not concerned here with the reasons motivating any voter in voting for or against the bond issue.

The record discloses no actual defect in the submission of the bond issue to the voters of the Town of South Charleston, and the ascertainment of the result of the election held pursuant to such submission. Nor is any irregularity disclosed in the proposed issuance of the bonds. We are, therefore, of the opinion that the proposed bond issue is valid and binding on the Town of South Charleston.

For the foregoing reasons we reverse the action of the Attorney General in disapproving said proposed bond issue, and direct that official to approve the same in accordance with the principles expressed in this opinion.

*Reversed.*

HAYMOND, PRESIDENT, concurring:

I concur in the judgment of the majority to reverse the action of the Attorney General in disapproving the bond issue, but I emphatically and finally disagree with its action in refusing to consider and determine in this proceed-

ing the questions of the legality of the use of the proceeds of the bonds to purchase the recreation property from the United States of America, the validity of the contract of October 10, 1941, and of the deed of June 10, 1941, and the effect of the proceeding in eminent domain by which the United States of America acquired title to the land upon the rights and the interests of the town and the board to the property involved in that proceeding.

This is the second attempt by the town and the board to present these questions to this Court, and each time it has refused to consider or resolve them. See *Town of South Charleston v. The Board of Education of Kanawha County*, 132 W. Va. 77, 50 S. E. 2d 880. As a matter of common sense and in fairness and in justice to the parties there should be an end to this litigation. It is crystal clear to me, for the reasons hereafter stated, that this Court can, and should, under the authority vested in it by Code, 1931, 13-1-26, which provides that this Court "shall decide the matters in controversy and enter such order thereon as to it may seem to be just", decide those questions and decide them here and now. Instead, for the second time, the majority refuses to do so, and merely directs the Attorney General to approve the bonds without determining whether their proceeds can be used to purchase the property which, indeed, is the one controlling question to which both the town and the board seek the answer in this proceeding. The result is to leave the whole matter in exactly the same situation it was in before the previous suit in equity was instituted by the town in the Circuit Court of Kanawha County and before it instituted this proceeding. After two unfinished proceedings in this Court, there is still uncertainty and confusion, further unnecessary litigation is impliedly invited, and needless resultant delay continues in disposing of the controlling questions here presented, and, in my judgment, necessarily involved.

After this proceeding was instituted in this Court, the board of education, obviously for the purpose of having the above enumerated questions decided, requested and

was granted permission to intervene as a defendant. The grounds assigned by the town in the brief and the oral argument of its counsel to reverse the action of the Attorney General in disapproving the validity of the bond issue were: (1) The contract of October 10, 1941, and the prior deed of June 10, 1941, are void because neither the town nor the board was lawfully authorized to make or enter into either of them; and (2) if the contract was valid, all rights of the board under it were extinguished by the subsequent proceeding in eminent domain between the United States of America and the town and the board. To support the action of the Attorney General the principal contentions presented in the brief and the argument in behalf of the board were that the contract of October 10, 1941, is valid, and that the town has no equity in the property in question. No party to this proceeding has presented, or even suggested, as an issue to be considered or determined, that the Attorney General lacked authority to consider or decide any of the questions involved or that this Court could not determine them in this proceeding. Despite the persistent and repeated efforts of all the parties to obtain a decision upon the issues actually presented, briefed and argued and notwithstanding the implied invitation to institute this proceeding to obtain such decision, in the statements in the opinion of this Court in the prior suit of the town against the board, 50 S. E. 2d 880, that: "It may be argued that the proceeds of the bonds which have heretofore been authorized by the voters to be issued cannot be applied to the purchase of the land by reason of the agreement between the town and board to make a lease, and that such doubt gives rise to a present, existing and justiciable controversy. We do not think so. A speedy and efficient method of testing the validity of a bond issue is provided by statute, Code, 13-1-25, 26.", the majority now refuses to consider the validity of the contract or the deed or the effect of the proceeding in eminent domain upon the rights and the interests of the town or the board in the recreation property, and which complacency limits its decision to the unpresented ques-

tions of the power of the Attorney General to determine the validity of the contract and the action "ordinarily" to be taken by this Court in a statutory proceeding of this character.

Whether the Attorney General has the authority to pass upon judicial questions which arise in connection with the approval or the disapproval by him of a bond issue under the statute is entirely immaterial and of no consequence or importance whatsoever in this proceeding. Conceding, as the majority holds, that the Attorney General, an executive officer, does not possess judicial powers and therefore cannot decide judicial questions, that conclusion does not affect or impair the right or the duty of this Court to exercise its judicial power to decide such questions in this proceeding. The important question here is not whether the Attorney General may decide the issues presented but whether this Court will make use of its jurisdiction, which it unquestionably possesses, and do so in this proceeding. I would refrain from any inquiry respecting the power and the authority of the Attorney General as immaterial and because that question is not raised by the pleadings, and would consider and determine the real and only issues raised by the pleadings and argued and submitted by the parties. I would not ignore the request of the parties for the bread of decision of the questions presented or answer it with the stone of evasion.

The review by this Court provided by the statute, Code, 1931, 13-1-26, of the action of the Attorney General is an original not an appellate proceeding. *State ex rel. Allen v. England,* 86 W. Va. 508, 103 S. E. 400. In that case this Court said: "It will be observed that the statute itself is a reference, not to our appellate jurisdiction given by the Constitution and statutes, but is an attempt at least to enlarge or confer original jurisdiction upon us to control the action of the attorney general in such cases. In construing statutes the rule is never to declare an act invalid on constitutional or other grounds unless there be no escape from doing so. We are committed to the proposition

that the legislature may in cases of this character enlarge
the remedy by mandamus or other original process when
no contractual or constitutional rights of persons or prop-
erty will be thereby invaded. *Boggess v. Buxton,* 67 W. Va.
679; *United Fuel Gas Co. v. Public Service Commission,*
73 W. Va. 571." As to the character of the proceeding the
statute, Code, 1931, 13-1-26, expressly states that if this
Court be of the opinion to hear and determine the matters
set out in the petition "the case shall be proceeded with as
in cases of original jurisdiction." Regardless of any lack of
authority of the Attorney General in the first instance to
pass upon judicial questions in approving or disapproving
the validity of a bond issue, this Court in a proceeding
under the statute to review and reverse or modify his
action, is not only empowered, but is expressly required,
to decide the matters in controversy. The provision of the
statute is that this Court "shall decide the matters in con-
troversy and enter such order thereon as to it may seem to
be just." Code, 1931, 13-1-26. This language is clear and
comprehensive and is binding upon, and ought to be ob-
served by, this Court. In consequence, I refuse to join the
majority in ignoring the plain mandate of the statute and
evading the decision of the issues actually presented, which
are "the matters in controversy" in this proceeding, under
the uncalled for pretense of denying similar power in the
Attorney General.

The other question decided is equally unnecessary and
the action of the majority in that respect is entirely
gratuitous. Though this Court held, in the recent case of
*Baxa v. Partlow,* 132 W. Va. 859, 50 S. E. 2d 825, that
ordinarily in a proceeding under Code, 1931, 13-1-26, the
only question to be considered is the approval or the dis-
approval by the Attorney General of the proposed bond
issue, and that generally this Court will not, in such pro-
ceeding undertake to supervise the expenditure of the pro-
ceeds of the bonds, the principle just stated, enunciated
and applied in that case, in my judgment, has no present
application. Here the legality of the expenditure of the
funds to be derived from the bonds for the sole and spe-

cific purpose for which the bonds were authorized by the voters is directly challenged because of the existence of a prior agreement between the town, the prospective purchaser of the property to be acquired and paid for with the proceeds of the bonds, and the board, its former owner, to execute a lease imposing restrictions upon the use and the enjoyment of the property by such purchaser which would adversely affect or impair its title and defeat the real purpose of the voters in authorizing the bonds. No situation of this kind was present in the *Baxa* case and for that reason the above stated principle of that case does not apply in this proceeding.

If the contract of October 10, 1941, is binding and enforceable, the use of the funds by the town in the proposed purchase of the recreation property, subject to the lease provided for in the contract, would constitute an unlawful diversion of the proceeds of the bonds and an expenditure of the funds for a purpose other than that authorized by the voters. Purchase of the property subject to the restrictions to be imposed by the lease, instead of its purchase free from such restrictions as required by the voters, would be to give them not that for which they voted but that for which they did not vote. *State ex rel. County Court of Mercer County v. Partlow*, 130 W. Va. 777, 45 S. E. 2d 506, 175 A. L. R. 813; *Jarrell v. Board of Education of Raleigh County*, 131 W. Va. 702, 50 S. E. 2d 442. The use or the expenditure of funds for a purpose different from that for which they were created and ordained by the voters constitutes an unlawful diversion of the funds which may be enjoined by a taxpayer in a proceeding instituted for that purpose. *Jarrell v. Board of Education of Raleigh County*, 131 W. Va. 702, 50 S. E. 2d 442; *State ex rel. County Court of Mercer County v. Partlow*, 130 W. Va. 777, 45 S. E. 2d 506, 175 A. L. R. 813; *Haws v. The County Court of Wayne County*, 86 W. Va. 650, 104 S. E. 119; *Harner v. Monongalia County Court*, 80 W. Va. 626, 92 S. E. 781; *Lawson v. County Court of Kanawha County*, 80 W. Va. 612, 92 S. E. 786; *Neale v. County Court of Wood County*, 43 W. Va. 90, 27 S. E. 370.

See *State ex rel. Allen v. England,* 86 W. Va. 508, 103 S. E. 400.

It is manifest to me that if the contract of October 10, 1941, is binding and enforceable against the town, it can not apply the proceeds of the bonds to the purchase of the property and in so doing comply with the provisions of the contract which require it to execute a lease imposing restrictions upon its use and ownership of the property; and that it can not expend the funds for any purpose whatsoever except the particular purpose for which they were authorized by the voters of the town. It follows necessarily that if the contract is valid no expenditure of the funds can lawfully be made. If this be the ultimate result, the bonds are legally as well as practically useless, their proceeds can not be expended for the purchase of the property, and their validity should be disapproved. On the contrary, if the contract is void, the funds may be used to purchase the property in the manner and for the purpose specified and authorized by the voters and the validity of the bonds should be approved. The only grounds upon which their validity is attacked arise from the existence of the contract and the issue was disapproved by the Attorney General solely for the reason that, because of the contract, the proceeds of the bonds can not be used to purchase the property. It necessarily follows that if the contract is invalid the issue is valid and should be approved. Approval of the validity of the issue, however, without a determination of the invalidity of the contract, would seem to me to be futile and inevitably to lead to subsequent litigation to determine whether the town should be enjoined from applying the funds to the purchase of the property or authorized to use them for that purpose. Without authorization to use the proceeds to purchase the property, approval of the bonds can produce only confusion and delay.

The question of the proper application of the funds actually and necessarily arises in this proceeding and it

should not be left for future decision in any subsequent independent litigation. That question should be settled upon review of the action of the Attorney General in a proceeding in which, by virtue of the statute, Code, 1931, 13-1-26, this Court is required to decide the matters in controversy and is empowered to enter such order as to it may seem to be just. The contract is valid and the bonds are invalid or the contract is invalid and the bonds are valid. If the bonds are valid, their proceeds may and should be used to purchase the property in question; if the bonds are not valid, none of their proceeds may be used for that purpose. If it were not for the contract of October 10, 1941, the validity of the bonds would be free from doubt. The questions of the legality of the expenditure of the funds for the purchase of the recreation property, the validity of the bonds, and the validity of the contract of October 10, 1941, and the deed of June 10, 1941, upon which that contract is based, and the effect of the proceeding in eminent domain upon the rights of the parties to the contract and the deed are inseparably interrelated and are matters here in controversy which it is necessary to consider and determine in this proceeding.

The remaining portions of this opinion indicate the questions presented by the pleadings and argued and submitted for decision by the parties, but which the majority has refused to consider or decide, state the repective contentions of the town and the board, and express my views on each of those questions.

As the principal source of its authority to make the deed of June 10, 1941, and to enter into the contract of October 10, 1941, the board relies upon Chapter 76, Acts of the Legislature, Regular Session, 1925, and Chapter 105, Acts of the Legislature, Regular Session, 1945, both of which relate to the establishment of a system of public recreation and playgrounds by certain governmental divisions in which are included boards of education and municipal corporations.

Section 1 of Chapter 76, Acts of the Legislature, 1925, Regular Session, provided that any city, town, county, independent school district or school district may establish a system of public recreation and playgrounds; set apart for such use any land or buildings owned or leased by it; acquire by gift, purchase, lease, condemnation, bond issue, or otherwise, and equip, any land, buildings, and other recreational facilities; employ a director of recreation and assistants; and expend funds for recreational and playground purposes. Section 2 authorized any two or more of the designated governmental divisions to establish and conduct jointly a system of public recreation and playgrounds and to exercise the powers given by the act. Sections 5 and 6, in their pertinent parts, provided that whenever a petition by a designated percentage of the voters shall be filed, in the manner specified, at least thirty days before any general or special election, the authorities of the governmental division shall submit to the voters the question of the establishment of a system of public recreation and playgrounds; that the same question may also be submitted at any election by the authorities on their own motion; and that, when that proposition is adopted by a majority of the qualified voters, the authorities shall provide for the establishment of the system and the levy and the collection of the necessary taxes which shall be in addition to and exclusive of all other taxes leviable and collectible by the governmental division.

A substantially similar statute was enacted by the Legislature and incorporated as Article 2 of Chapter 10 in the Code of 1931. Section 1 of this statute included much of the substance of Sections 1, 2, 3 and 4 of the Act of 1925, but expressly added the provision that before establishing any system of public recreation and playgrounds, or levying any tax for that purpose, the governing authority of the governmental division shall submit to its voters the question of the establishment of such system. Section 2 of the act then specified in practically the same manner as that provided in the Act of 1925, the methods and the

requirements of submitting the question to the voters. Chapter 105, Acts of the Legislature, 1945, Regular Session, amends and reenacts Article 2, Chapter 10 of the Code of 1931. It provides, in more detail than the two earlier statutes, for the establishment of the same system of public recreation and playgrounds by the same governmental divisions, and omits the requirement that the question of its establishment be submitted to the voters.

It does not affirmatively appear from the record in this proceeding which contains the record in the prior suit in equity that the board and the town, or either of them, compiled with the provisions of the Act of 1925 or of Sections 1 and 2 of Article 2 of Chapter 10 of the Code of 1931, in submitting to the voters the question of establishing a system of public recreation and playgrounds. The question of the validity of the contract and the deed, however, has been presented, argued and submitted by counsel respectively representing all parties to this proceeding on the theory that the establishment of such system was not submitted to the voters, and the contention of the board is that its submission was not necessary under Chapter 76 of the Acts of 1925, or Chapter 105 of the Acts of 1945. This attitude of counsel in effect concedes that the question was not so submitted, and consideration of that phase of this controversy should be based on that assumption.

Whether the Act of 1925 should be construed to require the question of the establishment of the system to be submitted to a vote need not now be dealt with for the reason that Section 1, Article 2, Chapter 10, Code, 1931, which was in effect when the contract and the deed were made in 1941, superseded the Act of 1925, and expressly required the question to be submitted to the voters before either the town or the board could establish such a system or levy any tax for that purpose. The failure to comply with the requirement of the later statute to submit the question to the voters renders groundless any contention

that it confers power or authority upon the town or the board to make the contract of October 10, 1941, or the deed of June 10, 1941.

The respondent, the board of education, however, insists that the contract of October 10, 1941, being executory in character and dependent upon the contingency that the United States of America convey the property to the town which has not yet occurred, and now can only occur, if at all, after the Act of 1945 has become effective, is authorized and validated by the provisions of that statute. This contention is without merit. The validity of the contract must be determined by the law in force at the time it was made; 17 C. J. S., Contracts, Section 22; 2 Elliott, Commentaries on the Law of Contracts, Section 683; *Belleville Advocate Printing Company v. St. Clair County,* 336 Ill. 359, 168 N. E. 312; *Islais Company v. Matheson,* 3 Cal. 2d 657, 45 P. 2d 326; *Turner v. Trial,* 24 Okla. 135, 103 P. 575; *Schaun v. Brandt,* 116 Md. 560, 82 A. 551; *Stewart v. Thayer,* 168 Mass. 519, 47 N. E. 420, 60 Am. St. Rep. 407; *Pacific Guano Company v. Dawkins,* 57 Ala. 115; *Miller v. The State,* 54 Ala. 155; and not when performance is required by its terms. See 13 C. J. 425; *Bias v. Atkinson,* 64 W. Va. 486, 63 S. E. 395; *Poling v. Board of Education of Philippi Independent District,* 56 W. Va. 251, 49 S. E. 148; *State ex rel. Spillman v. First National Bank of Nickerson,* 114 Neb. 423, 207 N. W. 674, 45 A. L. R. 1418. The general rule is that a court will not aid a party to an illegal contract to recover upon it if executory or to set it aside if executed. *Capehart v. Rankin,* 3 W. Va. 571, 100 Am. Dec. 779; *Brown v. Wylie,* 2 W. Va. 502, 98 Am. Dec. 781. See *American-LaFrance and Foamite Industries v. Arlington County,* 164 Va. 1, 178 S. E. 783; 6 Williston, A Treatise on the Law of Contracts, Revised Edition, 1938, Section 1758. The rule applies both at law and in equity. 17 C. J. S., Contracts, Section 272. In this respect there is no practical difference between a void or an invalid contract and an illegal contract; 2 Page, The Law of Contracts, 2d ed., Section 1026. These terms, however, though often confused, are not identical, and

courts recognize a marked distinction in general between contracts which are illegal, as involving an immoral purpose or as to which some penalty is imposed by law, and contracts which are merely invalid because contrary to some provision of law respecting the manner, the method, or the terms of performance, but which involve no moral turpitude and as to which no penalty is provided other than their invalidity. See *American-LaFrance and Foamite Industries v. Arlington County*, 169 Va. 1; 192 S. E. 758; *Schaun v. Brandt*, 116 Md. 560, 82 A. 551.

If the contract of October 10, 1941, was invalid because not authorized by law when it was made, it could be validated by a later curative enactment, for the Legislature may validate any obligation of a public corporation which it had power originally to authorize and, by statute subsequently enacted expressly for the purpose, cure the defect. 3 Page, The Law of Contracts, 2d ed., Section 1968; 6 Williston, A Treatise on the Law of Contracts, Revised Edition, 1938, Section 1758; *Bell v. Farmville and Powhatan Railroad Company*, 91 Va. 99, 20 S. E. 942; *Green v. City of Rock Hill*, 149 S. C. 234, 147 S. E. 346. When, however, a contract is absolutely void at its inception because made so by law, or it does not otherwise possess all the necessary requisites of a contract when entered into, it is not validated by a subsequent curative statute, or by repeal of the prohibitory law. 6 Williston, A Treatise on the Law of Contracts, Revised Edition, 1938, Section 1758. According to the decided weight of authority, a contract which is invalid under the law in force when it was made is not rendered valid by the enactment of subsequent legislation by virtue of which it would be legal to make such contract. 2 Elliott, Commentaries on the Law of Contracts, Section 684, *Lanning v. Osborne*, 82 F. 575; *Schaun v. Brandt*, 116 Md. 560, 82 A. 551. See 13 C. J. 261; 17 C. J. S. Contracts, Section 23; 12 Am. Jur., Contracts, Section 165.

It is settled by the decisions of this Court that a statute will be applied only to future cases unless legislative intent that it shall operate retroactively is clearly indicated

by its terms. *Lester v. State Compensation Commissioner,* 123 W. Va. 516, 16 S. E. 2d 920; *Central Trust Company v. Hall,* 106 W. Va. 687, 146 S. E. 825; *State v. Montgomery,* 94 W. Va. 153, 117 S. E. 870; *Fairmont Wall Plaster Company v. Nuzum,* 85 W. Va. 667, 102 S. E. 494; *Harrison v. Harman,* 76 W. Va. 412, 85 S. E. 646; *Barker v. Hinton,* 62 W. Va. 639, 59 S. E. 614, 13 Ann. Cas. 1150; *Stewart v. Vandervort,* 34 W. Va. 524, 12 S. E. 736, 12 L. R. A. 50. This rule applies to remedial statutes. *Thomas v. Higgs and Calderwood,* 68 W. Va. 152, 69 S. E. 654, Ann. Cas. 1912A 1039; *Fowler v. Lewis' Adm'r.,* 36 W. Va. 112, 14, S. E. 447. There is a presumption that statutes are intended to operate prospectively only, and this presumption is entitled to special weight in cases involving contract relations. *Lester v. State Compensation Commissioner,* 123 W. Va. 516, 16 S. E. 2d 920; *Hardin v. Workmen's Compensation Appeal Board,* 118 W. Va. 198, 189 S. E. 670. No such legislative intent or purpose appears from the language of Chapter 105, Acts of the Legislature, 1945, Regular Session, and that statute must be given prospective, and not retrospective, operation and effect. So considered, it does not authorize the action of the town or the board in making the contract of October 10, 1941, or the deed of June 10, 1941.

In considering the operation, the scope and the effect of the three foregoing statutes, it is pertinent to observe that the language of the Act of 1925 and of Section 1, Article 2, Chapter 10, Code of 1931, relates only to the acquisition of land, buildings and other recreation facilities by gift, purchase, lease, condemnation, bond issue, or otherwise, and that neither statute makes any provision for the disposition of such property in any manner whatsoever. Though the Act of 1945, which as previously indicated does not authorize the making of the contract or the deed by either the town or the board, does not expressly provide that lands, buildings and other recreational facilities may be acquired by a governmental division by gift, purchase, lease, condemnation, bond issue, or otherwise, the language employed indicates that it relates

only to their acquisition and it is doubtful that by the use of those words the Legislature intended to authorize the disposition of such property by any of those methods. At any rate, the statute contains no clear or express provision with respect to the manner in which any of the designated governmental divisions may dispose of any of its land, buildings or other recreational facilities, and in the absence from the statute of any provision of that kind, interpretation of the language used to permit the disposition of such property by gift, lease or condemnation would seem to be unwarranted. The law does not consider the right to dispose of property held in trust for the public as an incident to the ownership of such property. *Roper v. McWhorter*, 77 Va. 214. In numerous instances the right to acquire and the right to dispose of property are regarded as separate and distinct. For example, an infant or an insane person may acquire real estate by deed or by will, but neither can dispose of it by either of those methods. As this statute, however, does not apply to the contract or the deed, there is no need to construe the foregoing provision of that enactment.

As no authority is conferred upon the board by Code, 1931, 10-2-1, in effect at the time, without the approval by the voters, of the establishment of a system of public recreation and playgrounds, to make the deed of June 10, 1941, or upon the town to make the contract of October 10, 1941, it is necessary to consider whether any statute in effect when each of these instruments was made authorized such action by the board or by the town.

Article 5, Chapter 18, Code, 1931, as amended by various subsequent acts of the Legislature, deals with the powers and the duties of a county board of education which is given the supervision and the control of each county school district. Code, 1931, 18-5-7, as amended by Chapter 8, Acts of the Legislature, 1933, Extraordinary Session, in effect in 1941, provided, to the extent here pertinent, that such board shall ascertain at the beginning of each school year the buildings to be retained for school pur-

poses, and the buildings which because of their condition or location should be sold; that it may sell the undesirable buildings and the land on which they are located at public auction, after proper notice, and on such terms as it may order, to the highest responsible bidder; that by the same method prescribed for the sale of school buildings and lands, it may also lease for oil or gas or other minerals, any lands or school sites owned by it in fee; and that the proceeds of such sales and rentals shall be placed to the credit of such fund or funds of the district as the board may direct. This statute set forth the only purposes for which a board of education could sell or lease lands or buildings owned by it, and prescribed the sole method by which such sale or lease could be made, when the deed of June 10, 1941, was executed and delivered. A board of education is a corporation created by statute with only such functions of a public nature as are expressly given; it possesses only such power as is expressly conferred or fairly arises by necessary implication; and it may exercise the power conferred upon it only in the mode prescribed or authorized by statute. *Dooley v. Board of Education,* 80 W. Va. 648, 93 S. E. 766; *Herald v. Board of Education,* 65 W. Va. 765, 65 S. E. 102, 31 L. R. A. (N.S.) 588; *Honaker v. Board of Education,* 42 W. Va. 170, 24 S. E. 544, 32 L. R. A. 413, 57 Am. St. Rep. 847; *Shinn v. Board of Education,* 39 W. Va. 497, 20 S. E. 604; *Pennsylvania Lightning Rod Company v. Board of Education,* 20 W. Va. 360.

In *Herald v. Board of Education,* 65 W. Va. 765, 65 S. E. 102, 31 L. R. A. (N.S.) 588, decided before the statute in its earlier form was amended to authorize a lease for oil or gas or other minerals of lands or sites owned by a board of education in fee, this Court held that it could not lease such land for oil or gas. In *Madachy v. Huntington Horse Show Association,* 119 W. Va. 54, 192 S. E. 128, 111 A. L. R. 1046, a lease of its unimproved land by the board of education "for the purpose of conducting horse shows, fairs and livestock, horticultural, agricultural, and similar exhibitions, and use by the Boy Scouts or similar organizations" for a term of twenty years and which could

not be terminated by the board for any reason before the expiration of three years, five and one third months after its execution, was declared to be invalid. In Point 3 of the Syllabus in that case this Court said: "Where the terms of a lease of school property are such that under no contingency could the board of education terminate the lease and resume dominion over the property within a less period than three years and five and one-third months subsequent to its execution, such period is of unreasonable duration, the public weal considered, and consequently, the entering into such lease by the board of education was beyond its power and authority." In the opinion this language appears: "A board of education may properly acquire for school purposes ground which does not have buildings thereon or which may have buildings not adapted to school use. Where such property has been acquired by a board and is not to be improved by it at once, and cannot be advantageously employed for school purposes in its present state, the board may exercise reasonable discretion as to the use to which the property shall be subjected, pending the time when it will be devoted to school purposes. But this does not mean that where valuable property has been acquired by a board of education for school purposes, through expenditure of a large amount of public funds, it may enter into a long-term contract, placing the property to a use entirely foreign to the purpose for which public funds were expended. When a board undertakes to enter into such contract, it acts without warrant of law. 'The board of education of a school district is a corporation created by statute with function of a public nature expressly given and no other. It can exercise no power not expressly conferred or fairly arising by necessary implication, and in no other mode than that prescribed or authorized by the statute.' *Dooley v. Board of Education,* 80 W. Va. 648, 650, 93 S. E. 766. Other West Virginia cases emphasize this principle. *Herald v. Board of Education,* 65 W. Va. 765, 65 S. E. 102, 31 L. R. A. (N.S.) 588; *Honaker v. Board of Education,* 42 W. Va. 170, 24 S. E. 544, 32 L. R. A. 413, 57 Am. St. Rep. 847."

Under the statute and the above cited cases, it is manifest that the board was without power or authority to make the deed of June 10, 1941, which was based upon a nominal consideration and was in fact a gift of valuable property, acquired by the expenditure of a large amount of public funds. In consequence that instrument is wholly invalid and it conveyed no title to the property to the town.

As the town obtained no title to the property by the deed from the board, it had no right to make any contract to lease it to the board at any time, present or future, and its attempt to do so was without binding force or effect, even if it had possessed the power or the authority to make a contract of that character. Municipal corporations, like boards of education, derive their existence from the Legislature, are created by statute and, in the absence of express constitutional reservations in their favor or express limitations upon the control exercised upon them by the Legislature, possess only such powers as are directly conferred upon them by their charters and by general statutes. *Booten v. Pinson,* 77 W. Va. 412, 89 S. E. 985, L. R. A. 1917A, 1244; *Hornbrook v. Town of Elm Grove,* 40 W. Va. 543, 21 S. E. 851, 28 L. R. A. 416.

Numerous decisions of this Court hold that a municipal corporation possesses and can exercise certain powers and no others, and that such powers are: (1) Powers granted in express words by its charter or the general statutes under which it is incorporated; (2) powers necessarily or fairly implied in or incident to the powers expressly granted; and (3) powers essential to the declared objects and purposes of the corporation not simply convenient but indispensable. *Hyre v. Brown,* 102 W. Va. 505, 135 S. E. 656, 49 A. L. R. 1230; *County Court of Mineral County v. Town of Piedmont,* 72 W. Va. 296, 78 S. E. 63; *Harvey v. The City of Elkins,* 65 W. Va. 305, 64 S. E. 247; *State ex rel. Morley v. Godfrey,* 54 W. Va. 54, 46 S. E. 185; *Richards v. Clarksburg,* 30 W. Va. 491, 4 S. E. 774; *Parkersburg Gas Company v. Parkersburg,* 30 W. Va. 435, 4 S. E. 650; *City of Charleston v. Reed,* 27 W. Va. 681, 55

Am. Rep. 336; *Christie v. Malden,* 23 W. Va. 667. See
*State ex rel. Hatfield v. Porter,* 84 W. Va. 399, 99 S. E. 508;
*Roper v. McWhorter,* 77 Va. 214. It is also well settled
that the powers of a municipal corporation will be strictly
construed and that if there is a reasonable doubt that a.
particular power exists, such doubt will be resolved
against its existence. *Hyre v. Brown,* 102 W. Va. 505, 135
S. E. 656, 49 A. L. R. 1230; *State ex rel, Hatfield v. Porter,*
84 W. Va. 399, 99 S. E. 508; *County Court of Mineral
County v. Town of Piedmont,* 72 W. Va. 296, 78 S. E. 63;
*State ex rel. Morley v. Godfrey,* 54 W. Va. 54, 46 S. E. 185;
*Parkersburg Gas Company v. Parkersburg,* 30 W. Va. 435,
4 S. E. 650. No provision of the charter of the town or
of any general statute other than the provisions of Chap-
ter 76, Acts of the Legislature, 1925, Regular Session, and
Chapter 105, Acts of the Legislature, 1945, Regular Ses-
sion, already dealt with as inapplicable, conferring ex-
pressly or by fair or necessary implication, authority upon
the town to make the contract of October 10, 1941, has
been cited or found, and it is evident that there is no such
statutory provision. If the town were the owner of the
property and, as already indicated, it is not the owner, it
can not be said that its act in making the foregoing con-
tract is within the scope of any power which is essential
to the declared purpose of the town or is indispensable
to or, in the circumstances, even convenient for any nec-
essary municipal function. If the town were the owner
of the property, the contract would confer no special
benefits upon the town, but, on the contrary, as already
pointed out, would require the imposition of substantial
and lasting burdens and restrictions upon its use of the
property. The term of the lease provided for in the con-
tract, aside from the term of each renewal, is manifestly
for an unreasonable period of time and for that reason
alone its validity should be denied. *Madachy v. Hunting-
ton Horse Show Association,* 119 W. Va. 54, 192 S. E. 128,
111 A. L. R. 1046.

It is significant that no case sustaining the validity of
a contract, or a lease of property, covering a term of ninety
nine years, without the present additional provision for

renewals for a similar period, made by a municipal corporation has been cited or discovered as authority to justify or support the action of the town in making the contract of October 10, 1941. In *Smith v. Cornelius*, 41 W. Va. 59, 23 S. E. 599, 30 L. R. A. 747, which seems to be the only case in this jurisdiction involving a lease for a period as lengthy as ninety nine years by a public corporation of real estate held by it for the use and benefit of the public, a lease by a public corporation known as the Trustees of Berkeley Springs of certain lands and improvements to a private person for a term of ninety nine years was held to be *ultra vires* and void. In *Parkersburg Gas Company v. Parkersburg*, 30 W. Va. 435, 4 S. E. 650, this Court held that neither the charter of that city nor the general statutes in relation to municipal corporations, in force at the time, conferred upon the city the power to delegate to a private corporation the exclusive privilege of using streets and alleys for laying pipes and furnishing the city and its inhabitants with gas for a period of thirty years, although the authority of the city to make a contract without such exclusive privilege was impliedly recognized. In *Roper v. McWhorter*, 77 Va. 214, a twelve year lease by county and municipal authorities of a public ferry to a private person was declared to be *ultra vires* and null and void.

In support of its contention that the contract of October 10, 1941, is valid and enforceable, the board of education cites and relies upon the decisions of this Court in *Welch Water, Light and Power Company v. Town of Welch*, 64 W. Va. 373, 62 S. E. 497; *Allison v. City of Chester*, 69 W. Va. 533, 72 S. E. 472, 37 L. R. A. (N.S.) 1042, Ann. Cas. 1913 B, 1174; *City of Charleston v. Littlepage*, 73 W. Va. 156, 80 S. E. 131, 51 L. R. A. (N.S.) 353; and *Huntington Water Corporation v. The City of Huntington*, 115 W. Va. 531, 177 S. E. 290. All of those cases involved long term contracts of a municipal corporation, relating to light or water to be furnished to the municipality or its inhabitants, and, although other grounds were assigned, the main ground of attack upon the validity of the contract in each instance was that it created an un-

authorized indebtedness upon the part of the municipality. In each case this contention was properly rejected and the validity of the contract was sustained under the rule adhered to by this Court that the validity of a contract of a municipal corporation to purchase water for a period of years is ordinarily tested by the cost of the service for the first year. *Huntington Water Corporation v. The City of Huntington,* 115 W. Va. 531, 177 S. E. 290; *Allison v. City of Chester,* 69 W. Va. 533, 72 S. E. 472, 37 L. R. A. (N.S.) 1042, Ann. Cas. 1913B, 1174. It is evident that the power of a municipal corporation to make a contract to supply light or water to the municipality or its inhabitants is within the powers expressly conferred by its charter or by general statutes, or necessarily or fairly implied in or incident to power so expressly granted, or essential to the declared objects and purposes of the municipal corporation. A supply of water is an absolute necessity; it is not merely convenient, but is indispensable to the existence of the people of a municipality; and without the power to enter into a contract for that purpose a municipal corporation would be helpless and for all practical purposes unable to subsist. See *Allison v. City of Chester,* 69 W. Va. 533, 72 S. E. 472, 37 L. R. A. (N.S.) 1042, Ann. Cas. 1913B, 1174. The contracts involved in the above cited cases were made by the municipalities in the exercise of the above enumerated powers possessed by them. On that ground the validity of each contract may be sustained, and those cases are clearly distinguishable from the case at bar. The establishment of a system of public recreation and playgrounds by a municipal corporation is the exercise of a proprietary function, *Ashworth v. City of Clarksburg,* 118 W. Va. 476, 190 S. E. 763; *McVean v. The City of Elkins,* 127 W. Va. 225, 32 S. E. 2d 233; and in the exercise by a municipal corporation of its power to contract to supply or obtain light or water for the use of its inhabitants, the municipality also acts in its proprietary capacity. *Hyre v. Brown,* 102 W. Va. 505, 135 S. E. 656, 49 A. L. R. 1230. The vital and controlling distinction between a contract to supply light or water to a municipality and the contract of October 10, 1941, is that

a municipal corporation possesses the statutory power to make the one and the town, in this instance, was without such power to make the other. The action of the Legislature, in enacting the three statutes heretofore discussed and dealt with, to empower the designated public corporations to establish a system of public recreation and playgrounds in the manner provided in each enactment, amounts to legislative recognition that none of such corporations possesses such power under or by virtue of other statutes.

The deed of June 10, 1941, and the contract of October 10, 1941, both being invalid, the legal status of the board and of the town with respect to the property involved was unaffected and unchanged by either instrument. The title remained in the board and the town acquired no interest in the property. If the transactions between them had ended at that stage, the ensuing litigation might have been avoided. After the deed and the contract had been made, however, the board and the town arranged or consented to the institution of the proceeding in eminent domain by the United States of America against both of them to acquire title to the land then in law and in fact owned by the board. Though this proceeding was of a friendly nature, it was regular and valid in all respects, and resulted in the creation of a new title in the United States of America to the land free of any claim or interest whatsoever in it of either the board or the town. The order of the United States District Court of January 29, 1942, in effect expressly so provides. The recital, in that order, of the transactions and the agreements between the board and the town did not create or preserve any rights between them with respect to the land. The right or the power of eminent domain is an inherent and necessary attribute of sovereignty. *State v. Horner,* 121 W. Va. 75, 1 S. E. 2d 486. When property is taken in a valid proceeding in eminent domain, the taker does not derive title from the former owner but holds the property by a new and independent title. All inconsistent proprietary rights are extinguished. 18 Am. Jur., Eminent Domain,

Section 112. In the opinion in the case of *Duckett & Company v. United States*, 266 U. S. 149 45 S. Ct. 38, 69 L. ed. 216, the Supreme Court of the United States uses this language: "Ordinarily an unqualified taking in fee by eminent domain takes all interests and as it takes the res is not called upon to specify the interests that happen to exist. Whether or not for some purposes the new takers may be given the benefit of privity with the former holders, the accurate view would seem to be that such an exercise of eminent domain founds a new title and extinguishes all previous rights. *Emery v. Boston Terminal Co.*, 178 Mass. 172, 184; *Farnsworth v. Boston*, 126 Mass. 1, 8." With regard to the title acquired in a proceeding in eminent domain the opinion in the *Emery* case contains this statement: "And if there is such a thing as a new title known to the law, one founded upon a taking by the right of eminent domain is as clear an example as can be found." In *United States of America v. 19.86 Acres of Land in East St. Louis*, 141 F. 2d 344, 151 A. L. R. 1423, the United States Circuit Court of Appeals, Seventh Circuit, discussing the power of eminent domain, incorporates in the opinion this quotation from 10 R. C. L. 15: "The power when exercised acts on the land itself, not on the title or the sum of the titles if there are diversified interests. On appropriation all inconsistent proprietary rights are divested and not only privies but strangers are concluded." See also *United States v. Gossler*, 60 F. Supp. 971; *Jackson v. Pittsburg*, 36 Pa. Superior Ct. 274. It is clear that the United States of America acquired absolute and unqualified ownership of the estate in the land taken in the proceeding in eminent domain; that, as such owner, it acquired the right to dispose of it, in the manner provided by law, to the board or to the town or to any other purchaser; and that such purchaser may acquire such property free and acquit of any rights or interests in it of any and all former owners.

The claim of the board that it is entitled to rights and equities in its favor against the town by virtue of prior transactions between them, including the deed of June

10, 1941, and the contract of October 10, 1941, with respect to the recreation property, in the event the town should purchase it from the United States of America, is not well founded. As already indicated, both these instruments are invalid and no rights accrued to the board from either of them. As between the board and the town they are entirely without force or effect. No act of the town deprived the board of title to the land formerly owned by it and which it continued to own until it was divested of its title, not by any action of the town, but by the proceeding in eminent domain to the institution of which it consented. It is unfortunate that the board, acting under an honest but mistaken view of law, should lose title to land for which it originally paid the aggregate sum of $1,771.53. The town, however, did not receive this money or take any land from the board by the deed of June 10, 1941, or by any other means. It is its right, as well as its duty, to challenge the validity of the unauthorized contract of October 10, 1941, because of its lack of power to make it. See *Haymond v. Hyer*, 80 W. Va. 594, 92 S. E. 854, L. R. A. 1918B, 1; *Lanham v. Meadows*, 72 W. Va. 610, 78 S. E. 750, 47 L. R. A. (N.S.) 592; *Allegheny County v. Parrish*, 93 Va. 615, 25 S. E. 882. If the town purchases the recreation property, it will be required to pay, with public funds at its disposal and to which the board has no claim, the price fixed by the present owner, the United States of America, in order to obtain it. No rights or interests, cognizable or enforceable, at law or in equity, arise, or can arise, in favor of the board against the town, from the honest but *ultra vires* and invalid acts of both in connection with their efforts to establish a joint system of public recreation and playgrounds in general, or from the contract of October 10, 1941, in particular. The facts of this case, which established no fraud or dishonesty upon the part of any person connected with any of these transactions, or any other element of estoppel, constitute no basis for the application of that doctrine, against the town. With respect to the deed and the contract both the board and the town must be left in the position in which

each has placed itself by its own unauthorized conduct. As each of those written instruments was invalid, neither imposed any liability upon, or created any right or equity in favor of, any party to either of them. "An unauthorized or illegal contract executed by a public corporation, is incapable of enforcement. It is absolutely void, and neither the doctrine of estoppel nor ratification can be invoked to maintain it." *Herald v. Board of Education,* 65 W. Va. 765, 65 S. E. 102, 31 L. R. A. (N.S.) 588. See *Capehart v. Rankin,* 3 W. Va. 571, 100 Am. Dec. 779; *Brown v. Wylie,* 2 W. Va. 502, 98 Am. Dec. 781; *Poling v. Board of Education of Philippi Independent District,* 56 W. Va. 251, 49 S. E. 148; *Raleigh County Bank v. Bank of Wyoming,* 100 W. Va. 342, 130 S. E. 476; *Colbert v. Ashland Construction Company,* 176 Va. 500, 11 S. E. 2d 612; *American LaFrance and Foamite Industries v. Arlington County,* 164 Va. 1, 178 S. E. 783.

The board of education insists that the bond issue is invalid because the order for the election contained no statement relative to the contract of October 10, 1941, and that, for that reason, the statute, Code, 1931, 13-1-4, which requires all questions connected with the issue to be submitted to a vote of the qualified electors of the town, was not complied with or observed. It is not disputed that the order made no mention of the contract and it is manifest that if that contract should have been mentioned its omission from the order was not remedied or cured by the subsequently published notice to the voters that the recreation property, if purchased by the town, would be used only for civic, religious and recreation purposes, and that the officials of the town had no intention to purchase the property for the use of the school board under the terms of the lease provided for by the contract. Though the validity of the contract was not determined or determinable at the time of the election, that question, being judicial in character, could not be passed upon or decided by the voters. The contract was invalid, and in consequence, the omission of any reference to it in the order did not disregard any requirement of the statute. The order set forth

the requisites specified in the statute, including the purpose for which the proceeds of the bonds would be expended, which was stated to be the purchase of the recreation property to afford recreational, civic and municipal uses to the citizens of the town and, as the contract of October 10, 1941, is invalid, that purpose may be lawfully accomplished. The order for the election satisfied the requirements of the statute and the validity of the bonds can not be successfully assailed on the ground that it was insufficient or defective in that respect.

The principles stated and the views set forth in this concurrence do not apply to the rights and the obligations of the board and the town which may have arisen from the deeds made by the board to the town for other properties and the leases upon them made by the town to the board for the reason that these matters are not involved or presented in this proceeding and as to them no opinion is entertained or expressed.

Though as already stated I concur in the judgment of reversal, I would, for the foregoing reasons, consider and decide the questions actually presented, and hold that the deed and the contract are invalid, that the recreation property may be purchased by the town from its owner, the United States of America, free of any claim or equity of the board, and that the proceeds of the bonds may be used for that purpose.

I completely disagree with the conclusion of Judge Fox, as indicated in his concurring opinion, that the view expressed by me, that the town may purchase the recreation property free of any claim or equity of the board approves "the unworthy spectacle of the repudiation by a governmental agency of its solemn agreement, and of such repudiation being made effective by the mandate of this Court". There is no basis, in law or in fact, for the use of the quoted language. It erroneously assumes the validity of a manifestly invalid undertaking, and it is not

supported by sound reason or by citation of authority. It is also inconsistent with the holding of the majority, for the assumption of the validity of the instrument of October 10, 1941, necessarily presupposes consideration and determination of that question which the majority in which he is included has refused to do.

As I have demonstrated by the citation of numerous decisions of this Court, the so-called contract of October 10, 1941, is clearly and completely invalid and unenforceable, at law and in equity, and the contention that the refusal by the town to comply with such an undertaking can amount to the "repudiation" of its "solemn agreement" when no such "solemn agreement" exists at law or in equity, or that supposed or fanciful "equities" can spring into being from or by virtue of an invalid and unenforceable undertaking, in the total absence of any authority for either assertion, is an enigma which, I submit, his concurring opinion merely presents and proclaims but utterly fails to solve or explain. The conclusive answer is that there can be no "repudiation", recognizable as such at law or in equity, of a void undertaking and that of itself it can create no rights or equities in favor of any party to it. In consequence the refusal of the town to abide by the void contract of October 10, 1941, does not repudiate any legally valid or binding promise, or justify the inference that in purchasing the property with the proceeds of the bonds, its own funds, it invades or violates any existing legal or equitable right or claim of the board.

I am authorized to state that Judge Riley concurs with me in the views expressed in this opinion.

Fox, JUDGE, concurring:

I concur in the holding of the majority in this proceeding. However important it may be that the existing dispute between the Board of Education of Kanawha County and the Town of South Charleston be settled, it is just as important that in a matter involving the approval and

marketing of the bonded obligations of the state, counties, school districts and municipalities correct rules of procedure and action be defined and adhered to. With this thought in mind I am of the opinion that the function of the Attorney General, in cases of this character, is limited to passing on the legality of the bond issue, without regard to how the proceeds thereof may be expended, and I think we have authority for this position in the holding of this Court in *Baxa v. Partlow*, cited in the majority opinion. Of course, an expenditure for a purpose other than that for which the issue was proposed, can be prevented by appropriate proceedings independent of any question of the legality of the bond issue itself.

It would be unnecessary to say more were it not for the concurring opinion of Judge Haymond, concurred in by Judge Riley, which not only argues for the power of this Court to pass on the dispute between the Board and the Town, but proceeds to hold the Attorney General in error and decides the dispute aforesaid in favor of the Town of South Charleston. It is to this latter point of decision that this opinion will be directed.

My disagreement with the concurring opinion of Judge Haymond lies in the contention made therein to the effect that the Town of South Charleston is entitled to repudiate its solemn undertaking, an agreement in writing, and its recognition of that agreement on a court record, and as a reward therefor is permitted to take and hold absolute title to property for which, as between it and the Board of Education of Kanawha County, it paid nothing, and the title to which property it accepted, in the first instance, subject to its specific written agreement which this Court now permits it to repudiate, without placing the interested parties in *status quo*. The claimed justification for this contention, which, in my opinion, would bring about an unjust and inequitable result, is that a condemnation proceeding by which the United States of America acquired title to the property involved, wiped out all agreements

and all equities theretofore existing, as between the Town of South Charleston and the Board of Education of Kanawha County, in relation to the property here involved. The admitted fact that neither the Town of South Charleston, nor the Board of Education of Kanawha County, ever intended such result, and contracted against it, and recognized the force of such contract, is ignored.

That my position may be fully understood, let me state that I concede that the United States of America, through the condemnation proceeding, aforesaid, acquired absolute title to the property covered thereby, free and clear of any rights or equities therein, possessed by either the Town of South Charleston or the Board of Education of Kanawha County. Having acquired such absolute title, it could transfer the same to any person, other than the town or board, and the transferee would have held the same absolute title to the property as that vested in the United States of America. Furthermore, having such absolute title, it could transfer the same to either the Town of South Charleston or the Board of Education of Kanawha County, and vest in either the complete legal title thereto. But when the legal title to the property became thus vested in one of the parties to the 1941 agreement, referred to in the concurring opinion, the grantee of the legal title would, by reason of said 1941 agreement, hold the same in the same relation, and subject to the said agreement, as it was held before the condemnation proceeding was instituted. In this case, we may say that the holder of the legal title would hold the same in trust for itself and other interested parties; or we can say that a party to an agreement, such as existed in this case, is estopped from making any claim to property involved inconsistent with the agreement, under which it acquired title thereto, and that it is immaterial how it acquired title to such property. This proceeding is controlled by equitable principles. One who makes an agreement in respect to a particular property is held to that agreement so long as he holds title thereto, and his obligation thereunder is not

destroyed by the fact that the title has temporarily pass-
ed out of his hands. If he afterwards reacquires title, his
obligation exists to the same extent as when it was orig-
inally created, particularly when he contracts to do so.
The situation is analogous, although, of course, different,
from that where there is a general warranty of title to
real estate. Then, when an agreement is made between
parties, and one or both, as a result thereof, is induced to
surrender rights or property or otherwise prejudices him-
self, the other party is estopped to assert any claim, how-
ever derived, the effect of which, if admitted, would
amount to a repudiation of his original agreement. Here
the Board of Education of Kanawha County was induced
to part with valuable property, without any consideration
other than a lease agreement on the part of the grantee,
the Town of South Charleston; and if that agreement is
permitted to be repudiated, the Board of Education has
lost its property without compensation. I do not think it
necessary to cite authority in support of the fundamental
principles controlling a trust relationship or estoppel.
The concurring opinion is strangely silent in recognizing
their force, or even mentioning them.

The case at bar seems to present a clear instance where
these principles should be applied. The Board of Educa-
tion of Kanawha County purchased certain lots in South
Charleston at a cost of $1,771.53. By reason of the war
activities of the United States of America it was under-
stood that if the Town of South Charleston would furnish
a site, and otherwise sponsor the project, the United
States would erect a recreation building on the site so fur-
nished. To facilitate the project, there was an agreement
between the town and the Board of Education that cer-
tain lots theretofore purchased by the Board of Education
would be conveyed to the town without a money considera-
tion, but that in return for such conveyance the town
would lease the said lots, and the proposed recreation
building to be erected thereon, to the Board of Education
for a term of ninety-nine years, with provision for renewal

for two like periods. The conveyance of the lots was made by the Board of Education to the Town of South Charleston, on June 10, 1941, and the contemplated lease agreement was entered into on October 10, 1941. The whole purpose was to induce the United States of America to erect a recreation building on said lots, which it was believed would be a valuable asset to the community. It was, of course, contemplated that the town would convey the lots to the United States of America. When attorneys for the government looked into the matter, they concluded that it would be safer to institute a condemnation proceeding against both the Board of Education and the Town of South Charleston, and secure title to the lots in that way. This was done, and all interested persons, including the town and the board, were brought into the proceeding as parties. It was in effect a friendly suit. The United States of America paid a compensation of one dollar for the property which had cost the Board of Education the sum of $1,771.53. To show that this proceeding was not intended, as between the town and the board, to change the relation between them, as it affected said property, the final order in the condemnation proceeding entered on the 29th day of January, 1942, contained a recital of the agreement, between the board and the town, and the lease dated October 10, 1941, as follows: "* * * that if the land should be conveyed to the United States of America and it should reconvey it to the town or its designated grantee, the town, or such grantee, would forthwith lease the property to the board, in conformity to the form of the proposed lease, for a term of ninety-nine years with the right to renew it for two additional terms of ninety-nine years each and that the prior conveyance of the lots and the parts of lots by the board to the town should constitute the consideration for such lease." In that way, the Town of South Charleston, and the Board of Education, attempted to foreclose any claim which the town might make to the property, free of its contract with the board, in the event title to the property should thereafter become vested in the town. I know of no reason why this Court should feel

impelled to force the Town of South Charleston to repudiate this well understood and well defined obligation.

We have here a case where two public agencies, apparently acting in good faith with each other, and seeking to serve mutual interests, entered into a written agreement. One of them furnished the valuable property to which their agreement related. It may be that in entering into this agreement each exceeded its legal powers; but in that event, there being no fraud involved, if the agreement should be declared invalid, the parties would ordinarily be restored to the *status quo*. There was no legal test of the agreement prior to the condemnation proceeding, aforesaid, and that proceeding made such test unnecessary, so far as the United States was concerned. The United States, after obtaining title to the lots involved, erected a recreational building thereon. After the end of the war, the lots and building were declared surplus property and offered for sale, and the Town of South Charleston, and as we understand, the Board of Education of Kanawha County, desired to purchase the same, but in this case we are dealing with the offer of the town to purchase said property. In this situation, what is it that prevents the Town of South Charleston and the Board of Education of Kanawha County from having made effective the contract entered between them? Of what concern is it to the Federal Government, after it has parted with its title and received the price it demands therefor, what this Court may decree as between the town and the board? And, in the face of the plain agreement between the town and the board, how can the temporary ownership of the title to the property by the Federal Government be given the effect of nullifying the contract between the town and the board aforesaid.

According to the concurring opinion, the Town of South Charleston may purchase the said lots and the building thereon out of the proceeds of the $18,500.00 bond issue which it would approve; and when it does so, may hold

title to the same, free and clear of its obligation to lease the same to the Board of Education, under its contract of October 10, 1941, as recognized and referred to in the condemnation order of January 29, 1942; and may, in that manner, repudiate the very agreement which gave to it the claimed priority with respect to the right to purchase the property involved from the United States.

I do not believe that such a holding would conform to the principles of equity and fair dealing which should prevail in dealings between man and man, and which, for stronger reasons, should prevail as between agencies of government. These two governmental agencies set out, in good faith, to accomplish a result which was believed would be beneficial to the community which, in a different manner, was served by each. To effect this purpose the Board of Education conveyed valuable property to the Town of South Charleston, on the strength of a specific written agreement; an agreement which contemplated that the property so conveyed might thereafter be transferred to the United States of America, and still later might be reconveyed to the town. Every contingency was provided for to the end that the rights of the Board of Education in the property should not be lost; and yet, now that the contemplated return of the title to the said lots into the hands of the Town of South Charleston, in the same form as it was before the condemnation proceeding was instituted, is about to be effected, we are told that all the agreements aforesaid may be repudiated, the equities of the Board of Education destroyed, and, in effect, the money it invested in the property involved confiscated, all for the benefit of the Town of South Charleston, which can only accept such benefits by the repudiation of its agreement not to do so.

My position is that when and if the town purchases from the United States of America the lots and building here involved, it will hold the property in exactly the same relation as that in which it held the lots prior to the con-

demnation proceeding. In other words, it should be held to its solemn undertaking in that regard. That and nothing more. If the lease agreement should prove to be invalid, then, neither party being at fault, in any sense of intended wrong doing, they would be restored to the status they occupied before the deed of June 10, 1941, and the agreement of October 10, 1941, were executed. Of course, this would involve a reimbursement to the town of any amount paid by it to the United States of America. Thus equity would be dealt out to all parties concerned, and neither party would be unjustly enriched at the expense of the other. Furthermore, we would be saved the unworthy spectacle of the repudiation by a governmental agency of its solemn agreement, and of such repudiation being made effective by the mandate of this Court.